**ST. PAUL MERCURY INS. CO.,**

v.

**WILLIAMSON, et al.**

No. CIV. A. 1:93–1902.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Oct. 22, 1997.

Marshall G. Weaver, Brian B. Ripple, Henican James & Cleveland, Metairie, LA, Frederick B. Alexius, Provosty Sadler & deLaunay, Alexandria, LA, Gary J. Rouse, Ronald L. Riggle, Monroe & Lemann, New Orleans, LA, Gregory L. Jones, Farrar Law Firm, Pineville, LA, for St. Paul Mercury Ins. Co.

J. Ransdell Keene, Office of J. Ransdell Keene, Shreveport, LA, Christopher A. Hostage, Terrance G. Reed, Reed & Hostage, Washington, DC, Roark M. Reed, Waxahachie, TX, for Robert Williamson.

J. Ransdell Keene, Office of J. Ransdell Keene, Shreveport, LA, Terrance G. Reed, Reed & Hostage, Washington, DC, Roark M. Reed, Waxahachie, TX, for Sonya Williamson.

J. Ransdell Keene, Office of J. Ransdell Keene, Shreveport, LA, for Arlone Belaire.

Seahorse Farms, Lafayette, LA, pro se.

W. Gerald Gaudet, Robert M. Kallam, Bradley J. Haight, Vorrhies & Labbe, Lafayette, LA, Nancy J. Marshall, Ambrose V. McCall, James A. Nugent, Deutsch Kerrigan & Stiles, New Orleans, LA, Campbell E. Wallace, Spyridon, Koch et al, Metairie, LA, for Richard Vale.

W. Gerald Gaudet, Robert M. Kallam, Bradley J. Haight, Vorrhies & Labbe, Lafayette, LA, Campbell E. Wallace, Spyridon Koch et al, Metairie, LA, for Haynes Best Western of Alexandria Inc., Best Western Intern. Inc., H. L. Haynes, H.L. Haynes, Mrs., H & L Holding Co., American General Fire & Casualty, Maryland Casualty Co.

W. Gerald Gaudet, Robert M. Kallam, Bradley J. Haight, Vorrhies & Labbe, Lafayette, LA, for H L & H Holding Co.

## MEMORANDUM RULING AND JUDGMENT

TUCKER L. MELANÇON, District Judge.

Before the Court are five Motions for Summary Judgment filed by the various counterdefendants in this case. Counterdefendant Best Western International (BWI) has filed two partial motions for summary judgment, one seeking dismissal of counterplaintiffs' claims pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO) and the other seeking dismissal of counterplaintiffs' state law claims. Counterdefendants St. Paul Mercury Insurance Company and Richard Vale have each filed single motions for summary judgment seeking dismissal of all counterplaintiffs' claims. Finally, counterdefendants Mr. and Mrs. H.L. Haynes, H & L Holding Company, Haynes Best Western of Alexandria, American General Fire and Casualty Company, Maryland Casualty Company, and Best Western International collectively filed a summary judgment motion seeking dismissal of all counterplaintiffs' claims. For the rea-

sons that follow, all of the above motions are GRANTED.

## History

### A. Procedural Background

The consolidated actions forming this case arise from the prosecution of an allegedly fraudulent tort claim by Sonya J. Williamson and her husband Robert Williamson. In 1990, Sonya Williamson filed a personal injury action in the Civil District Court for the Parish of Orleans against Haynes Best Western Motel of Alexandria (HBW), its insurers and its related entities. Williamson alleged that "she was electrocuted on 21 July 1989 while attempting to turn off the light in her room in the [HBW]." *Williamson v. Haynes Best Western of Alexandria*, 688 So.2d 1201, 1202 (La.Ct.App. 4th Cir.1997). The jury found the accident was either staged or fraudulent, and judgment was entered in favor of the defendants. *Williamson*, 688 So.2d at 1204. On January 29, 1997 the Louisiana Fourth Circuit Court of Appeal affirmed the jury's verdict. *Id.* at 1242. The Louisiana Supreme Court denied applications for writs filed by the Williamsons on June 20, 1997, and the state court judgment is now final. *Williamson v. Haynes Best Western of Alexandria*, 695 So.2d 1355 (La.1997). The Williamsons also have initiated a separate state court action in Civil District Court for the Parish of Orleans, seeking to nullify the judgment rendered in Sonya Williamson's personal injury action.

St. Paul Mercury Insurance Company (St.Paul) was one of the named defendants in Sonya Williamson's personal injury action. St. Paul instituted this action on November 4, 1993, naming as defendants Robert Williamson, Arlone Belaire, Robert Williamson's mother, and Seahorse Farms, a Williamson family business. *R. 1, paras 4–6.* On December 12, 1994, St. Paul amended its complaint to add Sonya Williamson as a defendant. *R. 76.* St. Paul alleges that the Williamsons staged the electrical shock accident and that the Williamsons and Belaire have a lengthy history of asserting fraudulent personal injury claims. *See R. 1, Exhibit A.* St. Paul seeks recovery of the expenses incurred in connection with the defense of Sonya Williamson's personal injury action, and other damages, under civil RICO, 18 U.S.C. § 1961, *et seq.*, and under state law. *R. 1, paras 51–52.*

On September 25, 1996, the Williamsons filed a counterclaim against St. Paul, HBW, Mr. and Mrs. H.L. Haynes, H & L Holding Co. (HLH), American General Fire Company (American), Maryland Casualty Company (Maryland) and Richard Vale. R. 171. Vale was one of the defense attorneys in Sonya Williamson's personal injury action. The remaining counterdefendants are Best Western owners, entities or insurers that were named defendants in the personal injury action. The counterclaim generally alleges that the fraud defense asserted in Sonya Williamson's personal injury action, and as a basis for recovery in this action, is itself fraudulent. *R. 273, paras 3–5.* The Williamsons assert civil RICO violations against Vale, and they claim the other counter-defendants are vicariously liable and liable as aiders and abettors to Vale's RICO violations. *R. 273, paras 55–60.* Finally, the Williamsons bring nine separate state law claims against the counterdefendants. *R. 273, paras 69–107.* As a protective measure, the Williamsons filed a separate action in this court against the counterclaim defendants asserting the same bases of recovery (Civil Action No. 96–2263). That separate action has been consolidated with this case. The Court will consider the motions for summary judgment as addressing both the claims asserted in the counterclaim and the claims forming the basis of the consolidated case. For simplicity's sake, in this opinion, the Court will refer to the movants collectively as counterdefendants and to the Williamsons as counterplaintiffs.

When the counterclaims were first filed, counterdefendants filed motions to dismiss based upon failure to state a claim upon which relief could be granted. *R. 181; R. 200.* On April 3, 1997, Magistrate Judge Roy S. Payne issued a Report and Recommendation that all of the motions to dismiss be denied. *R. 258.* That Report and Recommendation was adopted by this Court on May 9, 1997. *R. 300.* Magistrate Judge

Payne also instructed counterplaintiffs to file an amended counterclaim. *R. 258, p. 12.* Counterplaintiffs filed their Second Amended Answer and Second Amended Complaint on April 23, 1997. In response, counterdefendants St. Paul and Vale again filed motions to dismiss on May 29, 1997 and June 17, 1997, respectively. *R. 319; R. 343.* A Report and Recommendation was issued by Judge Payne on September 25, 1997. *R. 678.* Magistrate Judge Payne recommended that the motions to dismiss be denied in all respects except with regard to the counterplaintiffs' state law claim pursuant to Louisiana Revised Statute 12:1220, which he recommended be dismissed with prejudice. *R. 678, p. 11.* This Court adopted Magistrate Judge Payne's Report and Recommendation on October 21, 1997.

Finally, there has been related litigation in the Eastern District of Louisiana. In 1993, the Williamsons sued a number of defendants, including present counterdefendants, alleging a conspiracy to deprive the Williamsons and others of their civil rights. *Sonya Williamson, et al. v. Ellis Pisciotta, et al.,* Civil Action No. 93–3729. By motion of the Williamsons, the civil rights claims against all defendants except Maryland Casualty Company, Ellis Pisciotta, Don Dixon and Larry Reagan were dismissed with prejudice. *Williamson,* 688 So.2d at 1204. U.S. District Judge Ginger Berrigan dismissed the claims against Maryland, Pisciotta, Dixon and Reagan without prejudice. *Id.* More recently, in January, 1997, U.S. District Judge Edith Brown Clement enjoined the Williamsons from asserting in the state action in nullity, or in any other action, any claims arising from the alleged civil rights violations.

## B. Factual Background

Counterplaintiffs allege that on July 21, 1989, Sonya Williamson was electrocuted in Room 170 of the Haynes Best Western Motel (HBW) in Alexandria, Louisiana. *R. 273, para. 8; R. 607, Exhibits 61, 62.* The electrocution allegedly occurred when Sonya Williamson came into contact with a hanging lamp that had been soaked in water due to a leak in the ceiling of Room 170. *Williamson,* 688 So.2d at 1206. In March, 1990, Sonya

Williamson filed a personal injury action against BWI, HBW and its owners, the Hayneses, and their insurers in the Civil District Court for the Parish of Orleans. *Id.* at 1202. After a three-and-a-half month trial, the jury returned a verdict in favor of the defendants, "finding that although Sonya Williamson was 'injured' while in the Haynes Best Western Motel, the accident was either staged or fraudulent." *Id.* at 1204. All of the defendants in the personal injury action were represented by the Blue Williams law firm through its partner Stephen Little. *R. 406, p. 4; R. 572, p. 3.* Mr. Little died in May, 1991, and Richard Vale, also a partner at Blue Williams, was substituted as counsel of record. *R. 572, p. 3.* Vale represented the defendants at trial. *Id.*

The fraud defense asserted by Vale at trial was based upon extensive evidence which is laid out in detail in the Louisiana Fourth Circuit Court of Appeal's decision. *See Williamson,* 688 So.2d at 1206–39. Briefly, Vale relied upon the Williamsons' extensive insurance claim history, which included at least thirty five lawsuits filed between 1969 and 1989 on behalf of Robert Williamson, Sonya *Williamson* and/or Arlone Belaire. *R. 1, Exhibit A; see also* 688 So.2d at 1222–23. Each of these suits involved personal injuries arising from various accidents. *See* 688 So.2d at 1228–34. In addition, Vale presented evidence suggesting the various Williamson family businesses "were not viable business entities" but rather were vehicles for obtaining insurance coverage. *Id.* at 1225–26. Vale also argued that the circumstances surrounding the alleged electrocution suggested fraud. These circumstances included the fact that the Williamsons were staying in a hotel in Alexandria over one month period when they lived in the same town, 688 So.2d at 1208, 1235, and that during that month "the Williamsons requested to be moved from room to room ... prior to their having settled in Room 170 ... the only room of the ones inhabited by the Williamsons that had a crawl space in the ceiling that was accessible to room guests." *Id.* at 1207. The accident was unwitnessed by anyone other than Robert Williamson and he continually refused medical treatment on behalf of his wife following the alleged electrocution. *Id.* at

1209–11, 1235. Finally, Vale asserted that the medical evidence of Sonya Williamson's alleged injuries indicated fraud. *Id.* at 1211–21. It revealed "[t]he ER doctor found no marks or burns on Sonya's skin to show electricity had entered her body." *Id.* at 1211. In fact, "[a]ll ER tests were normal." *Id.* The state court jury chose to credit much of the evidence presented by Vale as they determined that any injuries suffered by Sonya Williamson "w[ere] either staged or fraudulent." *Id.* at 1204.

Vale hired Mr. George Cassellas as a non-testifying expert during the defense of the personal injury action. *R. 575, p. 9; R. 607, Exhibit 12, pp. 23–25.* On July 21, 1991, Vale and Cassellas traveled to the HBW to inspect Room 107, the room in which Sonya Williamson was allegedly electrocuted. *R. 607, Exhibit 12, p. 6.* While in Room 107, Cassellas inspected the electrical system and took pictures of the hanging lamp involved in the alleged accident and the electrical fixtures in the room. *R. 607, Exhibit 12, pp. 10–16, Exhibit 13.* In the course of his inspection, Mr. Cassellas determined that there was stray voltage at the light switch located on the wall. *R. 607, Exhibit 17, pp. 9–10; Exhibit 16, p. 2.*

On July 11, 1997, this Court issued a Memorandum Order that "the facts known and the opinions held by Mr. George Cassellas are not discoverable." *R. 430.* In addition, on August 8, 1997, the Court conducted an on the record, in camera interview of Cassellas and concluded there was "no reason to alter its previous ruling that Mr. Cassellas is protected as a non-testifying expert pursuant to Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure." *R. 540.*

Prior to Cassellas' investigation of Room 170, the Williamsons' own electrical expert, Dr. Leonard Adams, inspected the room. *R. 575, Exhibit 14; R. 563, Exhibit A.* Dr. Adams found no violations of the National Electric Code. *R. 563, Exhibit A, p. 32.* In addition, Dr. Adams indicated that extraneous voltage at the wall switch could not have caused Sonya Williamson's electrocution at the hanging lamp. Id. at 37–38, 54. The Williamsons hired a second electrical expert, Dr. Eugene Tims, who inspected Room 170 after the Cassellas inspection. *R. 607, Exhibit 27, pp. 1–2.* Barbara Dubois, an HBW manager was present at this inspection and she informed Tims that the electrical system then in place in Room 170 was unchanged from the time of the alleged July 21, 1989 accident. Id. Counterplaintiffs claim that by the time Tims examined Room 170, the toggles of the wall switches formerly examined by Cassellas and the hanging lamp itself had been replaced. *R. 607, p. 15.*

In addition, at some time prior to the trial of Sonya Williamson's personal injury action, Vale and another defense attorney inspected a crawl space between Room 170 and the room directly above it—Room 270. *R. 607, Exhibit 25, p. 165.* Counterplaintiffs claim that photographs of this crawl space were taken by Vale and that these photographs reveal there is no concrete slab between Room 170 and Room 270. *Id., Exhibit 27.* Finally, a drain hole exists on the second floor of the HBW just above Room 170. *R. 607, Exhibit 2, p. 38.* Some evidence suggests that this drain hole was drilled soon after Sonya Williamson's alleged accident. *Id.*

*Summary Judgment Standard*

A motion for summary judgment shall be granted if the pleadings, depositions, and affidavits submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56.* Once the movant produces such evidence, the burden shifts to the respondent to direct the attention of the court to evidence in the record sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine issue worthy of trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. *Lavespere v. Niagara Mach. & Tool Works,*

*Inc.*, 910 F.2d 167, 178 (5th Cir.1990). Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### Analysis

#### A. The RICO Claims

#### 1. The RICO Statute

In *Crowe v. Henry*, 43 F.3d 198 (5th Cir. 1995), the Fifth Circuit articulated a "plain english" reading of the RICO statute. According to *Crowe*, the four applicable subsections of the RICO statute state:

(a) a person who has received income from a pattern of racketeering cannot invest that income in an enterprise;

(b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity;

(c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d) a person cannot conspire to violate subsections (a), (b), or (c).

*Crowe*, 43 F.3d at 203, 18 U.S.C. § 1962(a)—(d). *Crowe* goes on to explain that there are common elements to each of the four RICO subsections. "These common elements teach that any RICO claim necessitates '1) *a person* who engages in 2) a *pattern of racketeering activity*, 3) connected to the acquisition, establishment, conduct, or control of an *enterprise.*'" *Crowe*, 43 F.3d at 204 (emphasis in original), *citing Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir.1988). In the civil context, the RICO statute provides substantial remedies. Any person found to have violated the statute is liable for treble damages, costs, and attorney's fees. 18 U.S.C. § 1964(c).

Here, counterplaintiffs allege that counterdefendant Vale conducted the affairs of an enterprise through a pattern of racketeering activity in violation of subsection 1962(c). *R 273, para. 58*. Counterplaintiffs further allege that each counterdefendant, is liable as an aider and abettor in the 1962(c) violation and that each counterdefendant "ratified" the actions of Vale. *Id. at paras. 40, 60*. With the exception of St. Paul, all counterdefendants are also charged with vicarious liability for Vale's alleged 1962(c) violation. *Id. at para. 59*. Finally, a claim is made by counterplaintiffs that all counterdefendants conspired to violate the RICO statute in violation of subsection 1962(d). *Id. at para. 65*. Because the Court finds counterplaintiffs have failed to establish genuine issues of material fact regarding Vale's alleged RICO violations, it is unnecessary for the Court to address the issues of ratification, vicarious liability and aider and abetter liability.

#### 2. RICO Persons

"The RICO person in a civil or criminal action is the defendant." *Crowe*, 43 F.3d at 203. A RICO person is defined as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). While this definition seems extremely broad, the Fifth Circuit has identified a limiting principle. "[T]he RICO person must be one that either poses or has posed a continuous threat of engaging in acts of racketeering ... The continuous threat requirement may not be satisfied if no more is plead than that the person has engaged in a limited number of predicate racketeering acts." *Delta Truck*, 855 F.2d at 242. Participation in "isolated" or "sporadic" predicate acts does not qualify an individual or legal entity as a RICO person. *Crowe*, 43 F.3d 198 (5th Cir.1995). None of the counterdefendants have argued they are not "RICO persons." As a result, for the purposes of these motions, the Court will assume that all counterdefendants are RICO persons as required by the RICO statute and *Delta Truck*.

#### 3. Pattern of Racketeering Activity

■ The pattern element of a RICO claim has two components: "1) predicate acts—the requisite racketeering activity, and 2) a pattern of such acts." *In re Burzynski*, 989 F.2d 733, 742 (5th Cir.1993). For a RICO claim to survive a motion for summary judgment, there must exist genuine issues of material fact for each component. Counterplaintiffs allege 251 acts of mail fraud, one

act of witness intimidation and one act of bribery as a pattern of predicate acts. The Court will address the mail fraud, witness intimidation and bribery allegations in turn.

### a) The Predicate Acts of Mail Fraud

■ In their Second Amended Answer, counterplaintiffs identify 251 mailings which allegedly constitute mail fraud. *See R. 174, Exhibit A.* The mail fraud statute prohibits the use of the United States mails in furtherance of a scheme to defraud. 18 U.S.C. § 1341; *U.S. v. Curry*, 681 F.2d 406, 410 (5th Cir.1982). To establish the predicate act of mail fraud, a plaintiff must prove three elements: "(1) a scheme or artifice to defraud, (2) specific intent to commit fraud, and (3) use of the mails for the purpose of executing the scheme to defraud." *U.S. v. Blocker*, 104 F.3d 720, 730 (5th Cir.1997). In short, a plaintiff must prove that the mails were used for the purpose of carrying out a purposeful scheme to defraud.

Here, counterplaintiffs allege a scheme to defraud that included: "(1) misrepresenting the availability and amount of insurance coverage; (2) misrepresenting that the premises were free of defects and that Mrs. Williamson could not have been injured by the electrical fixtures in the room; and (3) misrepresenting that Sonya Williamson's injuries were not covered by insurance because of fraud." *R. 273, para. 48.* This scheme allegedly had the dual purpose of defrauding the counterplaintiffs and CIGNA Insurance Company (CIGNA) of "money and property" and of defrauding "Sonya Williamson, CIGNA, the state court, and the state court jury" of "money or property or their honest services." *R. 23 7, para. 48.*

■ Of the 251 mailings alleged as acts of mail fraud, 120 of them are worker's compensation checks mailed by CIGNA to pay for Sonya Williamson's medical care and maintenance. *R. 174, Appendix A.* Counterplaintiffs claim CIGNA is a "victim" of counterdefendants' fraudulent scheme because it made "disability and health care payments that are rightfully the legal responsibility of the insurer [counterdefendants]." *R. 273, para. 45.* Due to its alleged "victim" status, counterplaintiffs assert CIGNA's mailings constitute acts of mail fraud. *R. 607, pp. 35–36.* Counterplaintiffs correctly note "that the mailing in a federal mail fraud [claim] need not be sent by the defendant or his co-conspirator. It may be sent by a victim of the plot or an innocent third party." *U.S. v. Manges*, 110 F.3d 1162, 1169 (5th Cir.1997). However, this principle applies only "so long as the [victim's] mailing is 'incident to an essential part of the scheme, ... or a step in [the] plot.'" *Id., citing Schmuck v. U.S.*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1447–48, 103 L.Ed.2d 734 (1989). Thus merely identifying CIGNA as a "victim" of counterdefendants' scheme does not elevate CIGNA's mailings to incidents of mail fraud. Rather, evidence must exist which tends to show "the alleged scheme's completion [was] dependent in some way upon the information and documents which passed through the mails." *U.S. v. Pazos*, 24 F.3d 660, 665 (5th Cir.1994).

Here, the alleged fraudulent scheme involves alleged misrepresentations made to Sonya Williamson's attorneys regarding the amount and availability of insurance to induce a settlement below fair value and alleged misrepresentations made to the state court judge and jury regarding the cause of Sonya Williamson's injuries. *R. 273, para. 48.* Counterplaintiffs have failed to submit any evidence indicating that the mailing of worker's compensation checks by CIGNA was an "integral" part of this alleged scheme. *Manges*, 110 F.3d at 1169; *Pazos*, 24 F.3d at 665. Because completion of counterdefendants' alleged scheme was in no way dependent upon the CIGNA mailings, those mailings do not constitute acts of mail fraud.

■ However, even absent the CIGNA mailings, counterdefendants have alleged that various mailings by counterdefendant Vale furthered the alleged scheme to defraud. *R. 174, Appendix A.* Thus if evidence indicates both the existence of a scheme to defraud and that Vale's mailings furthered that scheme, counterplaintiffs have established predicate acts of mail fraud. "The definition of scheme to defraud is quite broad." *U.S. v. Curry*, 681 F.2d 406, 410 (1982). It "is not defined according to technical standards; ... it ... need only involve fraudulent representations or omissions rea-

sonably calculated to deceive persons of ordinary prudence and comprehension." *U.S. v. Finney,* 714 F.2d 420, 423 (5th Cir.1983). After a review of all the evidence submitted by the parties, the Court finds counterplaintiffs have failed to establish any issue of material fact regarding the existence of a "scheme to defraud."

Regarding the scheme to induce a settlement below fair value, counterplaintiffs have forwarded no evidence indicating how settlement efforts were impacted by the alleged scheme to defraud. *See R. 607, pp. 35–39 and supporting Exhibits.* In addition, counterdefendants have submitted answers to interrogatories, *R. 575, Exhibit 7,* discovery correspondences, *R. 575, Exhibit 8,* and responses to requests for production, *R. 575, Exhibit 9,* which indicate that discovery requests made on behalf of Sonya Williamson regarding insurance coverage and policies were answered by Vale. There exists no evidence of a fraudulent scheme to induce a settlement.

█ The alleged scheme to present a fraudulent defense in Sonya Williamson's personal injury cause of action also fails for lack of evidence. Counterplaintiffs allege that Vale, on behalf of counterdefendants, presented a defense that Sonya Williamson's claim was fraudulent when, in fact, Vale, knew this could not have been the case. *R. 607, pp. 15–23; R.273 paras. 48–49.* This allegation rests upon facts supposedly inconsistent with a fraud defense known to Vale at the time he presented this defense to the state court jury. These facts include: the facts and opinions of George Cassellas, the inspection of and photographs of the "crawl space" between Room 170 and Room 270 at the Haynes Best Western Motel (HBW), the possibility that the toggles of the wall switch and the lamp itself in Room 170 were changed, and the fact that there existed a drain hole above Room 170 of the HBW. *See supra* pp. 7–9 and cited Exhibits.

█ Because the facts and opinions of Cassellas have been held privileged and inadmissible at trial, *see R. 430; R. 540,* they cannot be used to defeat summary judgment. *Newport Ltd. v. Sears, Roebuck & Co.,* 6 F.3d 1058, 1064 (5th Cir.1993). Any change

in the conditions of the wall switch or lamp were made *after* Sonya Williamson's electrical expert, Dr. Leonard Adams, had an opportunity to inspect Room 170 and *after* that expert found no violations of the National Electric Code. *R. 575, Exhibit 14, pp. 32–35.* In a later deposition, Dr. Adams even indicated that "stray voltage at the [wall] switch" would have made no difference as to whether or not Sonya Williamson could have been electrocuted at the hanging lamp in Room 170. *R. 575, Exhibit 15, pp. 125–26; Exhibit 17, pp. 58–60.* Thus even assuming that Cassellas' opinions are admissible and that they were known to Vale during Sonya Williamson's personal injury trial, they do not establish that the electrocution of Sonya Williamson could not have been staged or fraudulent as Vale asserted at trial. The alleged alterations of the wall switch or hanging lamp are not indicative of a scheme to defraud.

Likewise, the fact that certain photographs do not reveal a cement slab between Rooms 170 and 270, *R 607, Exhibit 23,* does not confirm a scheme to defraud Sonya Williamson or the state court judge and jury, nor does the fact that a drain hole may have been drilled above Room 170 after Sonya Williamson's alleged electrocution. *R. 607, Exhibit 2, p. 38.* The fraud defense developed by Vale was largely premised on the assumption that the Williamsons staged Sonya Williamson's electrocution. *See R. 607, Exhibit 70, pp. 93–96.* The photographs of the "crawl space" and existence of a drain hole do not undermine the legitimacy of this defense. In addition, counterplaintiffs have made no allegation that the existence of the drain hole or the "crawl space" itself was not discoverable by the Williamsons prior to the personal injury trial. In fact, Sonya Williamson's attorneys questioned a defense witness at trial regarding the drain hole. *R. 607, Exhibit 9, p. 45.*

In short, none of the evidence submitted by counterplaintiffs indicates that Sonya Williamson's electrocution could not have been staged or fraudulent. Quite to the contrary, an abundance of evidence pointed to the possibility of fraud, *see Williamson,* 688 So.2d at 1206–38, and Vale's efforts to emphasize this

evidence at trial did not represent a scheme to defraud the Williamsons or the state court in any way. A plaintiff must demonstrate a scheme to defraud to prove the predicate act of mail fraud, *U.S. v. Blocker*, 104 F.3d at 730. Counterplaintiffs have failed to do so, and thus the mail fraud allegations fail as RICO predicate acts.

### b) The Predicate Act of Witness Intimidation

■ Counterplaintiffs allege a violation of the federal "Witness Protection Act" as a further predicate act supporting their theory of a pattern of racketeering activity. *R. 273, paras. 50–52.* In relevant part the Act prohibits the knowing use of intimidation, physical force, threats, corrupt persuasion, or misleading conduct with the intent to "(1) influence, delay, or prevent the testimony of any person in an official proceeding; ... [or] (2) cause or induce any person to ... be absent from an official proceeding to which such person has been summoned by legal process." 18 U.S.C. § 1512(b)(1), (b)(2)(D). The Act focuses upon intimidation of witnesses in *federal court* proceedings. "As used in sections 1512 and 1513 of this title ... the term 'official proceeding' means a proceeding before a judge or court of the United States." 18 U.S.C. § 1515(a)(1)(A). In addition, certain "proceeding[s] involving the business of insurance whose activities affect interstate commerce" are covered by the Act, but only those proceedings "before any insurance regulatory official or agency ... to examine the affairs of any person engaged in the business of insurance." 18 U.S.C. § 1515(a)(1)(D).

Counterplaintiffs point to a single encounter between Vale and Cassellas as witness intimidation. *R. 607, pp. 40–41.* During this encounter Vale allegedly "accosted, ... raised his fist in anger, and told Mr. Cassellas to cease and desist disclosing the results of the Vale–Cassellas inspection." *R. 273, para. 51; see also R 607, Exhibit 23, pp. 4–5.* These actions of Vale allegedly constitute a violation of Title 18, United States Code, Section 1512(b) because "[a]t the time of these acts of intimidation, these federal court proceedings were underway, and plaintiffs

intended to bring to the attention of this Court, and the jury, the testimony and evidence of George Cassellas." *R. 273, para. 52.* This Court has already concluded that "the facts known and the opinions held by ... George Cassellas are not discoverable [because] [t]here has been no voluntary waiver of the work product privilege ..." *R. 430, p. 1.* In addition, following a fifty-five minute, in camera interview with Mr. Cassellas, this Court found "no reason to alter its previous ruling that Mr. Cassellas is protected as a non-testifying expert pursuant to Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure." *R. 540.* Thus George Cassellas is ineligible to be a witness in "these federal court proceedings" as counterplaintiffs contend. *R. 273, para. 52.* Because he was retained by Vale as a non-testifying expert during the defense of Sonya Williamson's state court personal injury action, Vale's alleged "intimidation" of Cassellas amounted to nothing more than an effort to protect privileged information.

■ In addition, the documents supporting counterplaintiffs' Consolidated Opposition Brief To The Motions For Summary Judgment reveal that, at the time of the confrontation between Vale and Cassellas, Cassellas was preparing to testify before a *state* tribunal, not a federal one. The affidavit of Scott Hymel, who served as a paralegal to the attorneys for Sonya Williamson from 1990 to 1996, explains "I attended a hearing in *Civil District Court in November 1995 in the nullity action....* While I was in the hallway outside of the courtroom, I saw Richard Vale come up to George Cassellas and physically threaten him ..." *R. 607, Exhibit 23, p. 4* (emphasis added). The Witness Protection Act only "guard[s] the integrity and effectiveness of proceedings over which a federal body clearly has authority." *Puckett v. Tennessee Eastman Company,* 889 F.2d 1481 (6th Cir.1989).

The encounter between Vale and Cassellas does not represent a violation of the "Witness Protection Act" because Cassellas is ineligible to be a witness in this federal court proceeding and because the only contact between Vale and Cassellas occurred during a state court matter.

### c) The Predicate Act of Bribery

 Counterplaintiffs' Second Amended Complaint only alleges predicate acts of mail fraud and witness intimidation. *See R. 273, paras. 47–54.* However, in their Consolidated Opposition Brief To The Motions For Summary Judgment, counterplaintiffs assert "bribery" as a third predicate act in support of their RICO claims. *R. 607, p. 41.*

Federal Rule of Civil Procedure 9(b) states "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Fifth Circuit interprets Rule 9(b) as requiring "the plaintiff to allege 'the existence of facts and circumstances sufficient to warrant the pleaded conclusion that fraud ha[s] occurred' or face dismissal of his claim." *Norman v. Apache Corporation,* 19 F.3d 1017, 1022 (5th Cir.1994), *citing Haber Oil Co. v. Swinehart,* 12 F.3d 426, 439 (5th Cir.1994). The purpose of this interpretation is to "preclude litigants from filing baseless complaints and then attempting to discover unknown wrongs." *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993). Thus "a district court has the ability to grant a summary judgment *on facts* not briefed by the movant, as long as the non-movant has *notice of the issue.*" *Turco v. Hoechst Celanese Chemical Group, Inc.,* 101 F.3d 1090, 1093 (5th Cir.1996) (emphasis added).

Here, the pattern of racketeering activity alleged by counterplaintiffs is based upon fraud. "The Williamsons contend that counterdefendants falsely accused them of fraud and that they did so by perpetrating a fraud upon the state court, the state court jury, and the Williamsons." *R. 607, p. 2.* The pattern of fraudulent conduct asserted within Second Amended Complaint only includes predicate acts of mail fraud and witness intimidation. *R. 273, pp. 20–21.* Allegations of bribery do not appear in the Second Amended Complaint, *Id.* As such, counterplaintiffs have failed to plead this predicate act with specificity as required by Federal Rule of Civil Procedure 9(b). Because counterdefendants were not "on notice of the [bribery] issue," the Court will not consider the allegation of bribery raised for the first time in counterplaintiff's Consolidated Opposition Brief. *Turco,* 101 F.3d at 1093.

In sum, the Court finds that there exists no genuine issue of material fact regarding counterplaintiffs' allegations of mail fraud and witness intimidation. The Court will not consider the allegation of bribery raised for the first time in counterplaintiffs' Consolidated Opposition Brief. Each of the alleged predicate acts supporting counterplaintiffs' RICO claims have failed. Where no predicate acts exist, there can be no "pattern of racketeering activity." 18 U.S.C. § 1961(5); *Word of Faith World Outreach Center Church v. Sawyer,* 90 F.3d 118, 122 (5th Cir.1996). Thus the RICO claims asserted in counterplaintiffs' Second Amended Complaint must be dismissed.

Even assuming the existence of the alleged predicate acts, counterplaintiffs' RICO claims fail because there does not exist the requisite pattern of predicate acts for the reasons set forth below.

### d) The Pattern of Predicate Acts

 A plaintiff must demonstrate that alleged predicate acts constitute a "pattern of racketeering activity." *Burzynski,* 989 F.2d at 742. To prove a pattern of racketeering activity "a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1988) (emphasis in original). The element of "relatedness" is established if the predicate acts have the "same or similar purposes, results, participants, victims, or methods of commission." *Id.* at 240, 109 S.Ct. at 2901. To establish the "continuity" element "a plaintiff . . . must prove . . . a continuity of racketeering activity, or its threat." *Id.* at 241, 109 S.Ct. at 2902. Such continuity "may be shown by either a closed period of repeated conduct, or an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.'" *Word of Faith,* 90 F.3d at 122, *citing H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2901–02.

In *Word of Faith,* the Fifth Circuit articulated its approach to the RICO pattern requirement. "[W]here alleged RICO predi-

cate acts are part and parcel of a single, otherwise lawful transaction, a 'pattern of racketeering activity' has not been shown." 90 F.3d at 123. *See also Burzynski*, 989 F.2d at 742–43; *Calcasieu Marine National Bank v. Grant*, 943 F.2d 1453, 1464 (5th Cir.1991). The *Word of Faith* Court emphasized that "[s]hort term criminal conduct is not the concern of RICO." *Id.*, *citing Calcasieu*, 943 F.2d at 1464. Rather, a RICO claim must present a "threat ... of continued criminal acts." *Id.*

Assuming *arguendo* that counterdefendants committed the alleged predicate acts of mail fraud, there exists no evidence of a "threat of continued criminal acts." *Word of Faith*, 90 F.3d at 123. In *Burzynski*, the Fifth Circuit dismissed a RICO claim where the alleged predicate acts all occurred during the defense of a lawsuit. 989 F.2d at 742–743. Finding that "*[a]ll* of the alleged predicate acts took place as part of the *Burzynski I* litigation," the Fifth Circuit held "[t]he conduct did not constitute or threaten long-term criminal activity." *Id.* at 743 (emphasis in original). Rather, "the alleged multiple acts of fraud" were deemed "part and parcel of a single, discrete and otherwise lawful ... transaction ... the defense of a lawsuit." *Id.* at 742.

Here, every cognizable mail fraud allegation is based upon the mailings of motions, pleadings, discovery requests, or other documents related either to the defense of Sonya Williamson's personal injury action or to the present case. *R. 174, Appendix A.*[1] The scheme to defraud allegedly supporting the mail fraud allegations involves events which occurred during the defense of the personal injury action. *R. 607, pp. 35–40.* Likewise, the alleged act of witness intimidation occurred during a hearing on the Williamson's motion to have the state court jury verdict

declared a nullity. *R. 273, para. 51; R. 607, Exhibit 23, pp. 4–5.* Finally, even assuming the predicate act of bribery had been properly plead, it also allegedly took place during discovery in Sonya Williamson's personal injury action. *R. 607, p. 41; R. 607, Exhibit 11, pp. 38–39.* Counterplaintiffs argue that because these alleged predicate acts occurred over a "substantial span and duration" and involve several "species of conduct," they must be considered a pattern of racketeering activity. *R. 607, pp. 42–43.* The predicate acts alleged in *Burzynski* took place over a six year span of time and involved a wide variety of predicate acts. *Burzynski*, 989 F.2d at 737–38. However, the Fifth Circuit found no pattern of racketeering activity because the alleged predicate acts were all "part and parcel of ... the defense of a lawsuit." *Id.* at 743. In determining whether a pattern of racketeering activity has been established, the emphasis is not necessarily placed upon the duration of the alleged predicate acts, but upon whether a plaintiff has established the "threat of continued criminal acts." *Word of Faith*, 90 F.3d at 123. Counterplaintiffs have not made that showing.

### e) Conclusion

Counterplaintiffs have failed to establish the existence of any predicate acts that may support a RICO claim. In addition, even assuming the existence of the alleged predicate acts, counterplaintiffs cannot establish a "pattern of racketeering activity" as required by Fifth Circuit jurisprudence. *Word of Faith*, 90 F.3d at 123; *Burzynski*, 989 F.2d at 742–43. Because the existence of a "pattern of racketeering activity" is necessary in any RICO claim, *Crowe*, 43 F.3d at 204, the claims asserted in counts one and two[2] of counterplaintiffs' Second Amended Com-

---

**1.** The Court has already determined the checks mailed by CIGNA to Sonya Williamson were not "integral to the alleged scheme to defraud" and thus cannot be acts of mail fraud. *See supra pp.* 417–418. However, even if these mailings are included as predicate acts, counterplaintiffs have still failed to establish a pattern of racketeering activity. Assuming the CIGNA mailings were integral to a scheme to defraud, each CIGNA mailing relates to the subject matter of Sonya Williamson's personal injury lawsuit. These

mailings indicate no threat of "continued criminal activity." *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900–01.

**2.** In their Second Amended Complaint, counterplaintiffs refer to their various federal and state claims as "counts." Although it is not the usual practice of this Court to refer to allegations in a complaint in civil cases as "counts," the Court will do so in this instance as the parties have chosen this term.

plaint must be dismissed with prejudice as to all counterdefendants.

### B. The State Law Claims

Counts three through eleven of counterplaintiffs' Second Amended Complaint assert nine claims under various Louisiana state law theories. On September 25, 1997, Magistrate Judge Payne issued a Report and Recommendation granting motions to dismiss counterplaintiffs' claims pursuant to Louisiana Revised Statute 22:1220 filed by Vale and St. Paul. *R. 678.* This Court adopted Magistrate Judge Payne's recommendations on October 21, 1997. Magistrate Judge Payne's analysis applies with equal force to the remaining counterdefendants. Thus count seven of counterplaintiffs' Second Amended Complaint is dismissed with prejudice as to all counterdefendants. With respect to the remaining state law claims, counterdefendants argue that each of these claims have prescribed and, alternatively, that each claim fails for lack of any duty owed. *See R. 561, pp. 4–14.* The Court will first address the prescription argument and then assess the merit of each state law claim alleged by counterplaintiffs.

### 1. Prescription

■ Tort claims in Louisiana "are subject to a liberative prescription of one year." La. Civ.Code art. 3492. However, where a defendant's "conduct constitutes concealment, misrepresentations, fraud or other ill practices that prevents plaintiff from availing itself of its cause of action ... the doctrine of *contra non valentem* is triggered." *Our Lady of the Lake Hospital, Inc. v. Carboline Co.,* 632 So.2d 339, 343 (La.App. 1st Cir. 1993), *citing Bunge Corp. v. GATX Corp.,* 557 So.2d 1376, 1386 (La.1990). Where *contra non valentem* applies "[p]rescription ... will not begin to run until the plaintiff learns that it has been injured by the failure to disclose." *Id.*

■ Counterdefendants argue that Lawrence Smith and Randall Keene, the attorneys who represented the Williamsons from 1993 through 1997, learned of the state law claims no later than September 19, 1995. *R. 563, p. 20; R. 575, pp. 25–26.* Because the claims were not filed until September 25, 1996, counterdefendants assert those claims have prescribed. *R. 563, p. 20.* In support of their prescription argument, counterdefendants point to an affidavit of Scott R. Hymel, a paralegal for Smith and Keene, sworn on November 6, 1995. *R. 575, Exhibit 29.* Hymel states that he was traveling in a car with George Cassellas "on or about September 12, 1995." During this car ride, Cassellas informed Hymel that "he found extraneous voltage at the wall switch" of Room 170 at the HBW and that Vale had instructed him "not to report this defect in any report." *Id.* Hymel returned "to [his] office and informed Lawrence Smith and Randall Keene of these facts." *Id.* A subsequent deposition of Lawrence Smith confirms that Hymel told him of Cassellas' representations either "the next day or the day after" his car ride with Cassellas. *R 563, Exhibit D, p. 59.* "Within a week of the report by Scott Hymel," Smith contacted Cassellas, who confirmed Hymel's report. *Id.* at 60–61.

■ "Under Louisiana ... law, it is well settled that the knowledge of an attorney is imputable to his client." *Orgeron v. Mine Safety Appliances Co.,* 603 F.Supp. 364, 369 (E.D.La.1985), *citing Martin v. Schwing Lumber & Shingle Co., Inc.,* 228 La. 175, 81 So.2d 852 (1955). *See also Gilbert v. Pearson,* 478 So.2d 937, 940–41 (La.App. 3d Cir. 1985). Of the eight state law claims that survived counterdefendants' motions to dismiss, all but the invasion of privacy claim in count ten are based upon alleged misrepresentations made by Vale during Sonya Williamson's personal injury action. Thus knowledge of Cassellas' report by Smith and Keene marked the beginning of the one year prescriptive period with regard to counts three through six, eight, nine and eleven of counterplaintiffs' Second Amended Complaint. *Gilbert,* 478 So.2d at 940–41.[3]

---

**3.** As discussed above, the alleged violation of the Insurance Unfair Trade Practices Act, La.Rev. Stat. 22:1220, in count seven was dismissed as to all counterdefendants for the reasons given by

Magistrate Judge Payne in his Report and Recommendation of September 25, 1997, which was adopted by this Court on October 21, 1997. However, because this alleged violation is based

Counterplaintiffs assert that Smith and Keene did not learn of the Cassellas report until sometime after September 26, 1995. In support of this contention, they submit another affidavit by Scott R. Hymel sworn on August 29, 1997, *R. 607, Exhibit 23,* and a billing record. *R. 607, Exhibit 34.* In his second affidavit, Hymel declares his car ride with Cassellas did not occur on September 12, 1995, but on September 26, 1995. *R. 607, Exhibit 23, p. 2.* Hymel further states "I am certain of this date because I have reviewed the billing records for George Cassellas, and they reflect that the date of the inspection was September 26, 1995." *Id.* The billing record seems to confirm that the car trip took place on September 26, 1995. *R. 607, Exhibit 34.* However, the billing record is completely unsubstantiated and counterplaintiffs have provided no documentation that it would be admissible at trial. *Id.*[4]

The Court is extremely wary of the circumstances surrounding Hymel's second affidavit. It was prepared after counterdefendants had submitted their motions for summary judgment wherein they raised the prescription defense[5] and a full two years after the car trip with Cassellas, while the initial affidavit was prepared less than one month following the trip. *Compare R. 607, Exhibit 23 with R. 575, Exhibit 29.* In addition, Hymel's second declaration was apparently based not upon his own memory of the event, but upon a "review[ ][of] the billing records." *R. 607, Exhibit 23, p. 2.* Federal Rule of Civil Procedure 56(e) states "[s]upporting and opposing affidavits *shall* be made on *personal knowledge, shall* set forth facts as would be admissible in evidence, and *shall* show affirmatively that the

affiant is competent to testify to matters stated therein" (emphasis added). Hymel's declaration pertaining to the September 26, 1997 date is obviously not based upon "personal knowledge." Fed. R. Civ. Proc. 56(e). In addition, the Fifth Circuit has ruled "[a] party cannot create a factual dispute by filing an affidavit, after a motion for summary judgment has been made, which contradicts earlier testimony." *Dotson v. U.S. Postal Service,* 977 F.2d 976, 978 (5th Cir.1992). The Court will not consider Hymel's second affidavit as competent evidence in support of counterplaintiffs' opposition to summary judgment.

■ Excluding Hymel's second affidavit, the sole piece of "evidence" suggesting that Smith and Keene did not become aware of the Cassellas report until after September 26, 1997 is the unsubstantiated billing record. *R. 607, Exhibit 34.* Fifth Circuit case law holds "a plaintiff must respond to an adequate motion for summary judgment with admissible evidence." *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 191 (5th Cir. 1991). Because unauthenticated documents are "not the kind of evidence described in Rules 56(c) and 56(e) . . . it [is] . . . not the district court's duty to examine whether and how [such documents] might be reduced to acceptable form by the time of trial." *Id.* at 192. The billing record as submitted by counterplaintiffs is not admissible evidence. For this record to be admitted pursuant to the "business record exception" to the hearsay rule the "custodian or other qualified witness" must testify to its authenticity and to the fact that it was kept "in the course of a regularly conducted business activity." Fed. R.Evid. 803(6). Counterplaintiffs have failed

---

upon "Cassellas information," the prescription discussion that follows would apply to count seven. Count ten of counterplaintiffs' Second Amended Complaint alleges an "invasion of privacy." It is not based upon any facts known or opinions held by Cassellas. Rather, the invasion of privacy claim rests upon counterplaintiffs' discovery of surveillance photos and investigative reports. Counterdefendants have not provided the Court with any evidence as to when these items were discovered by counterdefendant. Thus the prescription discussion that follows does not apply to the invasion of privacy claim asserted in count ten of counterplaintiffs' Second Amended Complaint.

4. Counterplaintiffs have failed to include an affidavit from the custodian of the billing record or any other document indicating its authenticity or accuracy.

5. BWI and St. Paul filed their motions for summary judgment on August 15, 1997. *R. 561; R. 563.* The Hayneses, HLH, HBW, American and Maryland filed their motion of August 21, 1997. *R. 572.* Vale filed his motion on August 22, 1997. *R. 575.*

to provide an affidavit qualifying the billing statement as admissible evidence.

■ Without the benefit of Hymel's second, contradictory affidavit and the billing record, counterplaintiffs have no evidence suggesting Smith and Keene did not learn of the Cassellas report, and thus Vale's alleged misconduct, on or before at least September 19, 1995. In a final effort to avoid prescription, counterplaintiffs argue "[a]ll of the tort claims ... are continuous, and hence the continuing tort doctrine would preclude the commencement of any prescriptive period." *R. 607, p. 63.* Under the Louisiana continuing tort doctrine, "[w]hen the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated." *South Central Bell Telephone Co. v. Texaco, Inc.,* 418 So.2d 531, 533 (La.1982). Here, counterplaintiffs' tort claims are based upon the conduct of Vale during the defense of Sonya Williamson's personal injury cause of action. This conduct ended in September, 1994, when the trial in that matter concluded.

Based on all the evidence properly before the Court, the Cassellas report and Vale's alleged misconduct became apparent to Smith and Keene on or before September 19, 1995. The circumstances of Vale's alleged misconduct represent the basis of each of counterplaintiffs' remaining state law tort claims with the exception of the invasion of privacy claim alleged in count ten. Because these tort claims were not filed until September 24, 1996, they are barred by Louisiana's one year prescriptive period. Thus counts three through six, eight, nine and eleven of counterplaintiffs' Second Amended Complaint must be dismissed with prejudice as to all counterdefendants.

After a review of the record before it, the Court also finds each of the state law claims are without merit and will briefly discuss the individual claims.

### 2. Invasion or Privacy

■ The prescription discussion above does not apply to the "invasion of privacy" alleged by counterplaintiffs. *See supra* note 3. Claims for invasion of privacy may stem from four types of misconduct: "(1) the appropriation of an individual's name or likeness, for the use or benefit of the defendant; (2) an unreasonable intrusion by the defendant upon the plaintiff's physical solitude or seclusion; (3) publicity that unreasonably places the plaintiff in a false light before the public; and (4) unreasonable public disclosure of embarrassing private facts." *Young v. St. Landry Parish School Board,* 673 So.2d 1272, 1275 (La.App. 3d Cir.1996), *citing Jaubert v. Crowley Post–Signal, Inc.,* 375 So.2d 1386, 1389 (La.1979). For a defendant's conduct to be actionable, it "must be unreasonable and must seriously interfere with the plaintiff's privacy interest." *Young,* 673 So.2d at 1275. The reasonableness of a defendant's conduct is determined on a case-by-case basis "by balancing the conflicting interests at stake; the plaintiff's interest in protecting his privacy from serious invasion, and the defendant's interest in pursuing his course of conduct." *Jaubert,* 375 So.2d at 1389.

Counterplaintiffs allege an unreasonable intrusion upon their physical solitude or seclusion, which caused them "mental anguish, embarrassment, humiliation and severe emotional distress." *R. 273, paras. 102–04; R. 607, pp. 26–28.* This allegation is supported with photographs, *R. 607, Exhibit 43,* and investigative records, *R. 607, Exhibit 44.* The photographs depict various residences and certain individuals (presumably counterplaintiffs) walking in public. *R 607, Exhibit 43.* The investigative records reveal that numerous services were employed by various counterdefendants to conduct "activity checks" and "record checks" of Sonya and Robert Williamson. *R. 607, Exhibit 43.*

While counterdefendants' investigation of the Williamsons can certainly be characterized as extensive, the Court finds no evidence indicating its "unreasonableness." *Young,* 673 So.2d at 1275. As indicated above, the defense of Sonya Williamson's personal injury action was predicated upon a demonstration that her alleged electrocution was fraudulent. *Supra* pp. 414–415. This defense required not only an investigation into the alleged accident at the HBW on July 21, 1989, but also an investigation into the

Williamsons' lengthy claim history. *Id.* Counterdefendants clearly had an important interest in developing their fraud theory and, given the facts of this particular case, any intrusion into counterplaintiffs' privacy was outweighed by the counterdefendants' interest in conducting their defense.

### 3. Intentional Infliction of Emotional Distress

 Count three of counterplaintiffs' Second Amended Complaint asserts a claim of intentional infliction of emotional distress. *R. 273, paras. 69–72.* To recover for intentional infliction of emotional distress, a plaintiff must establish "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.,* 585 So.2d 1205, 1209 (La. 1991). The alleged conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

Here the "severe emotional distress" allegedly suffered by counterplaintiffs, *see R. 273, paras. 69–72,* was not the result of any "outrageous conduct." *White,* 585 So.2d at 1209. As stated above, *supra* pp. 417–419, Vale's conduct during the defense of Sonya Williamson's lawsuit was neither fraudulent nor "extreme and outrageous" and certainly did not "go beyond all possible bounds of decency." *White,* 585 So.2d at 1209.

### 4. Remainder of Counterplaintiffs' State Law Claims

#### a) The Substantive Counts

 With the exception of a conspiracy claim alleged in count eleven, the remaining state law claims asserted by counterplaintiffs in their Second Amended Complaint are grounded in various negligence theories. *See R. 273, paras. 73–86, 94–101, 105–107.*[6] Louisiana Civil Code, Article 2315 states "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." "The standard negligence analysis ... employ[ed] in determining whether to impose liability under Civil Code Article 2315 is the duty-risk analysis." *Mathieu v. Imperial Toy Corp.,* 646 So.2d 318, 321 (La.1995). This analysis consists of a four-prong inquiry: (1) was the conduct in question a "cause-in fact" of the harm?; (2) did the defendant owe a duty to the plaintiff?; (3) was the duty breached?; and (4) was the risk and harm caused within the scope of protection afforded by the duty breached? *Id.* at 321–22. Each of these four inquiries must be affirmatively answered in order for a plaintiff to recover. *Id.* at 322.

 In their Consolidated Opposition Motion, counterplaintiffs argue that counterdefendants owed them a variety of "duties" during the course of Sonya Williamson's personal injury litigation. *See R. 607, pp. 65–79.* These duties are summarized by counterplaintiffs as "a general duty ... not to falsely accuse another of engaging in a fraudulent act." *Id.* at 65. Assuming *arguendo* that counterdefendants did owe certain duties to counterplaintiffs, the evidence before the Court confirms that neither Vale nor any other counterdefendant breached any duty.

The conduct of counterdefendants during the defense of Sonya Williamson's personal injury action was entirely reasonable. As stated previously, there existed substantial evidence indicating Sonya Williamson's July 21, 1989 electrocution was fraudulent. *See supra* pp. 414–415. The evidence now before the Court indicates that the defense Vale presented to the state court jury was neither fraudulent nor misleading. In addition, the conduct of Vale during discovery was not unreasonable. Counsel for Sonya Williamson had every opportunity to inspect Room 170

---

**6.** Specifically, counterplaintiffs assert claims based upon: "negligent infliction of emotional distress" (count four), "abuse of process" (count five), "negligent supervision and retention of an agent" (count six), "spoliation" (count eight), and "impairment of tort claim and defense" (count nine).

of the HBW prior to the inspection by Cassellas. *R. 575, Exhibit 14; R. 563, Exhibit A.* At any rate, this Court has held the facts and opinions known by Cassellas are privileged. *R. 430; R. 540.* Thus, Vale owed counterplaintiffs no duty of any kind regarding revelation of the Cassellas information. Finally, the evidence before the Court reveals counterdefendants fully complied with counterplaintiffs' requests for disclosure of insurance information during Sonya Williamson's personal injury action. *R. 575, Exhibits 7–9.* There exists absolutely no evidence indicating that Vale or any other counterdefendant breached any duty owed to counterplaintiffs.

### b) The Conspiracy Count

 Louisiana law does recognize a civil action for conspiracy. "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." La. Civ.Code art. 2324. However, article 2324 does not create "an independent cause of action for civil conspiracy." *Jefferson v. Lead Industries Assoc., Inc.,* 106 F.3d 1245, 1253 (5th Cir.1997). Rather, "[t]he actionable element under article 2324 is the intentional tort the conspirators agreed to commit and committed in whole or in part." *Id.* at 1254. Because the Court has determined that none of the counterplaintiffs' state law claims survive counterdefendants' motions for summary judgment, the conspiracy count cannot stand on its own.

### C. Conclusion

The Court finds no evidence supporting any of the alleged predicate acts which underlie counterplaintiffs' RICO claims. As such, no pattern of racketeering activity can exist. Assuming *arguendo* the validity of the alleged predicate acts, the Court finds no evidence indicating they form a "pattern of racketeering activity." Thus counterplaintiffs' RICO claims in counts one and two of their Second Amended Complaint are dismissed with prejudice as to all counterdefendants.

With regard to counterplaintiffs' state law claims, count seven is dismissed with prejudice for the reasons stated by Magistrate Judge Payne in his Report and Recommendation of September 25, 1997. The claims asserted in counts three through six, eight, nine and eleven of counterplaintiffs' Second Amended Complaint have prescribed. In addition, the claim of intentional infliction of emotional distress in count three fails because none of the counterdefendants' conduct during the defense of Sonya Williamson's personal injury action was extreme and outrageous. The alleged invasion of privacy asserted in count ten fails because the investigation of the Williamson family conducted by counterdefendants was not unreasonable. The claims in counts four, five, six, eight and nine must be dismissed because none of the counterdefendants breached any duty they may have owed to counterplaintiffs. Finally, the conspiracy alleged in count eleven fails because each of counterplaintiffs' substantive state law claims are dismissed. Thus, each of the state law claims appearing in counts three through six, eight, nine and eleven of counterplaintiffs' Second Amended Complaint are dismissed with prejudice as to each counterdefendant.