United States Court of Appeals,

Fifth Circuit.

No. 94-40166.

Larry D. CROWE and Sue Ellen Crowe Silman, as Administratrix of
the Succession of Reba Coody Crowe, Plaintiffs/Appellants,

v.

Sam O. HENRY, III, the Law Firm of Blackwell, Chambliss, Hobbs &
Henry, Murray Blackwell, Jr., Frank N. Chambliss, James A. Hobbs,
Chet Harrod, Douglas C. Caldwell, K. Tod Cagle, and Continental
Insurance Co., d/b/a/ CNA, Defendants/Appellees.

Jan. 30, 1995.

Appeal from the United States District Court for the Western
District of Louisiana.

Before JOHNSON, HIGGINBOTHAM and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

Larry D. Crowe[1] brought this RICO[2] action against Sam O. Henry,
III, his attorney, and against Henry's law firm, each individual
partner of that firm and the firm's insurer. Crowe contended that
Henry, with the aid of the firm, engaged in a series of fraudulent
acts through which Henry converted, for his personal benefit,
certain property owned by Crowe. The defendants brought a motion
to dismiss under Fed.R.Civ.P. 12(b)(6) which the district court

_____

[1]The central dispute in this case involves property
originally owned by Larry Crowe and the succession of his wife,
Reba Coody Crowe. Hence, this suit was actually brought by Larry
Crowe and Sue Ellen Crowe Silman as the administratrix of the
Succession of Reba Coody Crowe. However, as the interests of
Larry Crowe and the Succession are the same and as Larry Crowe is
the prime mover in the facts underlying the claim and in the
prosecution of this action, the plaintiffs will be hereinafter
collectively referred to as "Crowe."

[2]Racketeer Influenced and Corrupt Organizations Act, 18
U.S.C. § 1961 *et seq.*

1

granted finding that the plaintiffs had failed to sufficiently plead a RICO enterprise. We affirm in part, reverse in part and remand.

I. FACTS[3] AND PROCEDURAL HISTORY

Larry Crowe is a farmer and a businessman. In the early 1960s, he met Sam Henry and they became friends and business associates. Over the next twenty-five to thirty years, Henry, through his firm of Blackwell, Chambliss, Hobbs & Henry (hereinafter "the firm"), represented Crowe and his family in most of their legal matters.

In the mid-1980s, Crowe became involved in litigation with James W. Smith and People's Homestead. Henry, who was representing Crowe in that action, advised Crowe to accept $1.175 million in settlement from People's Homestead so that they could concentrate on the threat from Smith. Moreover, to protect the settlement funds from any possible judgment that Smith might obtain against Crowe, the money was placed into accounts in the name of the law firm.[4]

At about this same time, Henry and Crowe began to discuss a joint venture involving buying and developing farm land in East

---

[3]The facts and allegations in the plaintiffs' complaint are legion. This summary, drawn from the complaint, develops only such facts as are needed for the resolution of this matter.

[4]Henry and/or the firm wrote several checks from these funds which Crowe contends were unauthorized. These checks included amounts to pay down the mortgage on the West Carroll property, a $30,000 check to the firm for disputed legal fees, and a $30,000 check to purchase a condominium for Henry in Baton Rouge.

Carroll Parish (East Carroll).[5]  To accomplish the purchase of this property, Crowe and Henry planned that land which Crowe owned in West Carroll Parish (West Carroll)[6] would be used as collateral. Further, they anticipated that funds from the People's Homestead settlement would be used to clear most of the debt on West Carroll in order to get ready for the joint venture.

However, still concerned about the possibility of a judgment against Crowe in favor of Smith, Henry advised Crowe to transfer various immovable properties to him in "trust."  Chiefly,[7] this involved Crowe "selling" West Carroll to Henry with the secret, oral[8] understanding that Henry would return the property to Crowe upon request.  Despite any such sale, though, Crowe insists that the parties understood that Crowe remained the true owner of the land.

This "sale" took place in early 1987.  To gain court approval for the sale, Crowe alleges that Henry[9] misled the court about the value of the property, the amount of debt encumbering it, and the

---

[5]This property was also known as Deborah plantation and was a 2,414 acre tract.

[6]This property consisted of about 900 acres of land and was the site of the Crowe family home.

[7]Crowe asserts that a similar pattern occurred with several smaller parcels of land owned by Crowe in Catahoula Parish.

[8]Crowe alleges that Henry advised him that it would be unwise to prepare a counter letter evidencing this arrangement because such a letter would be discoverable in the litigation involving Smith.  Accordingly, no counter letter exists.

[9]Acting at Henry's direction, Douglas C. Caldwell, a member of the firm, aided in this transaction by drawing up and mailing to the court or the clerk several of the documents involved.

danger of foreclosure. According to the papers submitted to the court, the consideration paid by Henry to purchase this property was the assumption of certain indebtedness. However, Crowe maintains that both he and Henry knew that the indebtedness allegedly assumed had either already been satisfied or was otherwise not valid and thus that Henry effectively gave no consideration. After this "sale," Crowe and his family remained on the property.

On the day that title to West Carroll was transferred to Henry, he placed a collateral mortgage on it for the purchase of East Carroll. Title to East Carroll was placed in Henry's name. Even so, Crowe contends that the parties (Crowe and Henry) understood that Crowe owned fifty percent of East Carroll[10] and that East Carroll was only titled in Henry's name alone to protect the property from the Smith litigation.

Initially, Henry financed the purchase by a loan from the Federal Land Bank. This was interim financing, however, and Crowe expected that two new loans would be obtained. One loan would be for $300,000 on West Carroll and the other would be for $1,000,000 on East Carroll. Crowe believed that this was the best arrangement because it would keep the ownership and the financing on the two properties separate. However, in late 1989, Henry refinanced the debt with a combined loan from an out-of-state bank.

---

[10]Crowe maintains that his consideration for this ownership percentage in East Carroll was the use of West Carroll as collateral for the purchase and the utilization of his farming expertise, his labor and his equipment in working the East Carroll land.

4

From 1987 to 1989, East Carroll and West Carroll were farmed as combined acreage either by Larry Crowe or under lease. Even when the property was under lease, though, Crowe provided equipment and services to help with the farming. Crop proceeds or lease payments from those years went to pay the mortgage and to buy additional farm equipment and make improvements to the land.[11]

In 1990, Crowe and Henry decided to farm East Carroll and West Carroll separately. As the two properties were burdened by the same mortgage, they drew up a Farm Operating Agreement under which the mortgage payment would be allocated as twenty-nine percent to West Carroll and seventy-one percent to East Carroll. The funds would be sent to Henry at his office and he would make the combined mortgage payment.

Crowe became concerned, however, when Henry made it known that he wanted the money from West Carroll sent to him and marked as rent. Under that arrangement, Crowe worried that Henry could claim that he was paying all of the note on the properties. Moreover, Crowe began to suspect that all of Henry's actions were being taken to freeze him out and to erase any evidence of his ownership. Therefore, Crowe instead tendered West Carroll's portion of the mortgage into the registry of the court.

On June 22, 1990, Henry sent a letter to Crowe informing Crowe

---

[11]In addition to farming the land, Crowe and Henry applied for U.S. Department of Agriculture Agricultural Stabilization and Conservation Service (ASCS) payments in the name of Crowe, Henry and members of Henry's immediate family. From the years 1987-89, checks in the amount of $207,087.35 were sent to Henry at his office at the firm and were used for Henry's personal benefit.

5

that no one in the firm represented him any longer. Litigation ensued shortly thereafter and Henry sought to evict Crowe from West Carroll. Members of the firm participated in drawing up documents and submitting them to the court to accomplish this eviction.

Crowe brought the instant suit against Henry, the firm, each individual partner of the firm and the firm's insurer on a myriad of state theories and on a civil RICO claim. As to the RICO claim, Crowe sought relief for alleged violations of 18 U.S.C. §§ 1962(a), (b), (c) and (d). In response, the defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) contending that Crowe had failed to adequately plead 1) a pattern of racketeering activity; 2) violations of 18 U.S.C. § 1962; and 3) a RICO enterprise.

The district court found sufficient allegations as to a pattern of racketeering activity and as to violations of 18 U.S.C. § 1962, but agreed with the defendants that Crowe had failed to adequately plead a RICO enterprise. Accordingly, the district court dismissed the RICO claim. The pendent state claims were later dismissed making the action final. Crowe now appeals to this Court.

II. STANDARD OF REVIEW

In the instant case, the district court dismissed Crowe's claims for failure to state a claim under Fed.R.Civ.P. 12(b)(6). A motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts." *Ward v. Hudnell,* 366 F.2d 247, 249 (5th Cir.1966). Dismissal cannot be upheld unless it

appears beyond doubt that the plaintiffs would not be entitled to recover under any set of facts that they could prove in support of their claim. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Worsham v. Pasadena,* 881 F.2d 1336, 1339 (5th Cir.1989). This Court independently applies the same standards employed by the district court. *Tel-Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1138 (5th Cir.1992).

III. RICO VIOLATIONS

Crowe has alleged RICO violations under 18 U.S.C. § 1962(a), (b), (c), and (d). Reduced to their simplest terms, these subsections state that:

(a) a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;

(b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity;

(c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d) a person cannot conspire to violate subsections (a), (b), or (c).

Common elements are present in all four of these subsections. *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.,* 868 F.2d 740, 742 (5th Cir.1989). These common elements teach that any RICO claim necessitates "1) a *person* who engages in 2) a *pattern of racketeering activity,* 3) connected to the acquisition, establishment, conduct, or control of an *enterprise.*" *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 242 (5th Cir.1988); *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989)

7

(emphasis in original). *See also, Calcasieu Marine Nat. Bank v. Grant,* 943 F.2d 1453, 1461 (5th Cir.1991).

A. RICO *Persons*

The RICO person in a civil or criminal RICO action is the defendant. *Landry v. Air Line Pilots Ass'n Int'l,* 901 F.2d 404, 425 (5th Cir.), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). The statute defines the RICO person as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). This is a very broad definition. However, this Court has recognized that if we are to restrict RICO to the type of conduct that Congress intended to proscribe,

> the RICO person must be one that either poses or has posed a continuous threat of engaging in acts of racketeering.... The continuous threat requirement may not be satisfied if no more is pled than that the person has engaged in a limited number of predicate racketeering acts.

*Delta Truck,* 855 F.2d at 242.

In this case, Crowe has alleged two RICO persons in his complaint—Henry and the firm. As to the firm, we note that Crowe has only alleged a limited number of predicate acts. The firm only appears a few times in this drama. Specifically, Crowe refers to the firm's involvement in drawing up court documents for the 1987 sale and the 1990 eviction and to the firm writing, from funds owned by Crowe but in the account of the firm, what Crowe contends was an unauthorized check for legal fees in the amount of $30,000. Even if all of these actions constituted predicate acts under RICO, which we do not now decide, we find them to be too isolated and

sporadic to support a finding that the firm was a RICO person. These few acts, spread out over a four-year period, simply do not show the continuous threat of racketeering activity that RICO was designed to address.

As to Henry, however, we conclude that Crowe has succeeded in naming a sufficient RICO person. Henry is certainly an individual capable of holding a legal or beneficial interest in property and thus he meets the statutory definition. 18 U.S.C. § 1961(3). Moreover, for the reasons stated below, we find that Henry's actions, as alleged, also meet the continuity requirement.

B. *Pattern of Racketeering Activity*

The district court found that Crowe had adequately pled the existence of a pattern of racketeering activity consisting of numerous predicate acts of mail fraud[12], wire fraud[13], financial institution fraud[14] and theft of goods in interstate commerce.[15] We agree that Crowe's allegations are sufficient.

C. *Enterprise*

A plaintiff asserting a RICO claim must allege the existence of an enterprise. *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 427 (5th Cir.1987). A RICO enterprise can be either a legal entity or an association-in-fact. *Manax v. McNamara,* 842 F.2d 808, 811 (5th Cir.1988). In this case, Crowe has alleged enterprises

---

[12]18 U.S.C. § 1341.

[13]18 U.S.C. § 1343.

[14]18 U.S.C. § 1344.

[15]18 U.S.C. § 659.

9

consisting of either Crowe himself, as a businessman and farmer, or an association-in-fact consisting of Crowe, Henry and the firm or any combination thereof. For the reasons given in its opinion, we agree with the district court that Crowe has not sufficiently pled a RICO enterprise consisting of either Crowe as an individual or an association-in-fact involving the law firm. However, we disagree with the district court and conclude that Crowe has alleged an enterprise composed of an association-in-fact of Crowe and Henry.

Crowe has pled that he and Henry associated in fact to operate a farming venture.[16] To establish an association-in-fact enterprise, a plaintiff must "show "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit.' " *Atkinson v. Anadarko Bank and Trust Co.,* 808 F.2d 438, 440 (5th Cir.), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987) (quoting *U.S. v. Turkette,* 452 U.S. 576, 582, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). This formulation of an association-in-fact enterprise incorporates the notion of continuity. *Calcasieu,* 943 F.2d at 1461. Accordingly, this Court has determined that an "association-in-fact enterprise 1) must have an existence separate and apart from the pattern of racketeering, 2) must be an ongoing organization and 3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Delta Truck,* 855 F.2d at 243. *See, Calcasieu,* 943

---

[16]Even Henry, in his answer to this suit, characterizes the Crowe and Henry collaboration as a joint venture.

10

F.2d at 1461; *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989); *Old Time Enterprises, Inc. v. International Coffee Corp.,* 862 F.2d 1213, 1217 (5th Cir.1989); *Foval v. First National Bank of Commerce,* 841 F.2d 126, 129-30 (5th Cir.1988).

The farming venture alleged does appear to exist separate and apart from the pattern of racketeering. Crowe and Henry's association extended beyond Henry's alleged acts of fraud and theft. In order to shield Crowe's assets, they operated a jointly owned farming business, produced and sold crops, and purchased farming equipment. Moreover, this farming operation lasted for almost four years[17] and Crowe contends that he and Henry acted as equal partners and met on a regular basis to make decisions concerning the operation. Therefore, we find that Crowe has adequately pled an association-in-fact enterprise consisting of Crowe and Henry to operate a farming venture.

D. Violations of 18 U.S.C. § 1962(a), (b), (c), and (d)

The defendants herein also contend that Crowe has failed to adequately allege violations of the RICO subsections, 18 U.S.C. § 1962(a), (b), (c), and (d). As to subsections (a) and (b), we disagree.

Under subsections (a) and (b), there must be a nexus between the claimed RICO violations and the injury suffered by the plaintiff. *Old Time,* 862 F.2d at 1219. For subsection (a), this means that the injury must flow from the investment of racketeering

---

[17]In addition, this farming venture might have gone on indefinitely had Crowe not become suspicious and had litigation not ensued.

income into the enterprise. *Parker and Parsley Petroleum Co. v. Dresser Industries,* 972 F.2d 580, 584 (5th Cir.1992). Crowe has alleged such an injury. Funds that he owned, that were allegedly fraudulently taken from the People's Homestead settlement, were invested into the enterprise and used to reduce the indebtedness on land that Crowe alleges was taken from him through a pattern of racketeering activity. As to subsection (b), a plaintiff must show that his injuries were proximately caused by a RICO person gaining an interest in, or control of, the enterprise through a pattern of racketeering activity. *Old Time,* 862 F.2d at 1219. Crowe has certainly alleged that Henry gained ownership of his land and the farming venture through a pattern of racketeering activity. Accordingly, we find that Crowe has adequately alleged substantive violations of 18 U.S.C. § 1962(a) and (b).

The defendants are correct, however, that Crowe cannot successfully make out a claim under 18 U.S.C. § 1962(c). This subsection forbids any "*person* employed by or associated with any *enterprise* " from participating in or conducting the affairs of the enterprise through a pattern of racketeering activity. *Id.* (emphasis added). Because of the structure of this language, this Court has held that the RICO person and the RICO enterprise must be distinct. *Bishop v. Corbitt Marine Ways, Inc.,* 802 F.2d 122, 123 (5th Cir.1986).

In this case, Crowe has alleged that Henry is both the RICO person and a member of the Crowe/Henry association-in-fact. This Court has found, though, that a RICO person cannot employ or

12

associate with himself under this subsection. *In re Burzynski,* 989 F.2d 733, 743 (5th Cir.1993). Accordingly, Crowe's claim under 18 U.S.C. § 1962(c) fails because there is not a sufficient distinction between the person and the enterprise. *Bishop,* 802 F.2d at 123.

Lastly, the defendants are also correct that Crowe has failed to adequately allege a RICO conspiracy under 18 U.S.C. § 1962(d). "[B]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Tel-Phonic,* 975 F.2d at 1140 (citing *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990)). While Crowe has pled the conclusory allegation that the defendants herein "conspired," nowhere does he allege facts implying any agreement to commit predicate acts of racketeering. Therefore, Crowe's claim under 18 U.S.C. § 1962(d) must also fail.

IV. AIDING AND ABETTING AND VICARIOUS LIABILITY

The law firm challenges Crowe's claim that the firm aided and abetted Henry in his alleged scheme to defraud Crowe. To sufficiently plead aider and abetter liability for this fraud, Crowe would have had to allege facts showing that the firm participated in the fraud as something it wished to bring about, and sought by its actions to make it succeed. *Armco Industrial Credit Corporation v. SLT Warehouse Co.,* 782 F.2d 475 (5th Cir.1986). Mere negative acquiescence in the fraud is insufficient. *Id.*

13

In the complaint, Crowe specifically alleges that the firm aided and abetted Henry.  Further, Crowe explains how and when this aid occurred—in particular, that members of the firm helped draw up documents for the sale of West Carroll in 1987 and for the eviction of Crowe in 1990.  Nothing in the complaint is inconsistent with these allegations.[18]  Hence, we find that Crowe has adequately pled that the firm aided and abetted Henry in his alleged scheme to defraud.

Finally, the firm argues that it cannot be held vicariously liable for the actions of Henry.[19]  In examining this question, we note that, as discussed in part IIID above, the only claims that remain open to Crowe are for violations of 18 U.S.C. § 1962(a) and (b).  With this in mind, we find no barrier to vicarious liability in this case as such liability has been found to be available under subsections (a) and (b) when the principal has derived some benefit

---

[18]The complaint does provide that in August of 1990, Crowe and his mother sent a letter to each partner in the firm complaining of Henry's actions.  The firm argues from this that since Crowe had to notify the firm's partners of Henry's alleged fraud, this shows that the firm was not aware of it.  However, we conclude that this merely shows that Crowe was uncertain whether the members of the firm knew of the alleged fraud and is not inconsistent with Crowe's allegation that the firm aided and abetted Henry.  Moreover, while the firm notes that Crowe describes Henry's plan as "secret," it is perfectly possible that Henry hid the plan from Crowe but shared it with the firm.

[19]In *Landry,* this Court found that under 18 U.S.C. § 1962(c), an entity that is the RICO enterprise cannot be held vicariously liable because to do so would be to treat it as both the RICO person and the RICO enterprise.  901 F.2d at 425.  This holding is inapplicable here, though, because as discussed in part IIID above, Crowe's underlying claim based on 18 U.S.C. § 1962(c) is not valid.

14

from the agent's wrongful acts.[20] *Landry,* 901 F.2d at 425; *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1307 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

V. CONCLUSION

Crowe has failed to adequately plead facts to support that the firm is a RICO person and thus that it committed RICO violations. Also, Crowe has failed to sufficiently plead violations of 18 U.S.C. § 1962(c) and (d). To that extent, we AFFIRM the judgment of the district court. However, Crowe has adequately pled

1) an association-in-fact enterprise consisting of Crowe and Henry to operate a farming venture;

2) that Henry, a RICO person, engaged in a pattern of racketeering activity connected to the acquisition, establishment, conduct, or control of that enterprise;

3) that Henry committed violations of 18 U.S.C. § 1962(a) and (b); and

4) that the firm aided and abetted Henry in his scheme to defraud.

Accordingly, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

---

[20]Crowe has alleged that the firm has received some benefit from the actions of Henry. Specifically, Crowe alleged that the firm received at least $30,000 in disputed legal fees.