**STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPA-
NY, Plaintiff,**

v.

**Alexander GIVENTER and Michael
Merlin, Defendants.**

**No. Civ.A. 3:98–CV–2918–L.**

United States District Court,
N.D. Texas,
Dallas Division.

April 30, 2002.

David Kassabian, Kassabian & Doyle, Arlington, TX, Ross O. Silverman, John E. Farrell, Nicole Nehama Auerbech, Katten, Muchin & Zavis, Chicago, IL, William W. Davis, Neal, Gerber & Eisenberg, Chicago, IL, for plaintiff.

Bruce M. Friedman, Law Office of Bruce M. Friedman, Los Angeles, CA, for Bruce Friedman, Inc.

Alexander Giventer, DC, Los Angeles, CA, pro se.

Gilbert R. Geilim, Law Office of Gilbert R. Geilim, Los Angeles, CA, for Michael Merlin.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDSAY, District Judge.

Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") filed this lawsuit on December 14, 1998, asserting claims against Defendants Alexander Giventer ("Giventer"), Michael Merlin ("Merlin") and other individuals and entities,[1] for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and for common law fraud. This case was scheduled to begin trial on February 20, 2002. On February 15, 2002, the court held a pretrial conference. Giventer and Merlin failed to appear either personally or by counsel, and did not obtain the court's consent for their nonappearance. At the pretrial conference, State Farm made an oral motion for entry of default against Giventer and Merlin based on their failure to appear at the pretrial conference or otherwise defend. On February 21, 2002, the court issued an order granting State Farm's motion for entry of default, and entered default against Giventer and Merlin. A prove-up hearing on the remaining issue of damages was held on February 26, 2002. The court now files its findings of fact and conclusions of law as to Defendants Alexander Giventer and Michael Merlin pursuant to Fed.R.Civ.P. 52(a).

### I. Contentions of the Parties[2]

#### A. State Farm's Contentions

State Farm contends that Giventer and Merlin were participants in a conspiracy to present fraudulent insurance claims based on intentionally caused automobile collisions. Specifically, State Farm alleges that, from 1993 through 1996, Giventer and Merlin and other individuals, owned, operated, and/or controlled law offices and chiropractic clinics in Dallas County, Texas, through which they submitted fraudulent insurance claims arising out of at least 153 deliberately caused automobile collisions. State Farm contends that these staged accidents typically involved participant drivers, as well as phony passenger victims, who were recruited by street level organizers known as "cappers" or "runners." According to State Farm, the scheme operated in this manner. Participant drivers caused "Sudden Stop Collisions" by intentionally maneuvering their vehicles in front of non-suspecting motor-

---

1. Plaintiff named sixteen individuals and entities as Defendants in its Original Complaint, which it subsequently amended to include four more individuals. All Defendants, with the exception of Giventer and Merlin, have either been dismissed from the action or settled.

2. The information recited in this section was obtained from the proposed joint pretrial or-

der submitted in this case. Neither Merlin nor his counsel participated in the preparation of the proposed pretrial order, or otherwise submitted a summary of his defenses for inclusion in the pretrial order. Consequently, no contentions on behalf of Merlin are included in the court's Findings of Fact and Conclusions of Law.

ists and then deliberately slamming on the brakes to cause rear-end collisions. After the deliberately caused collision, cappers would take participant drivers and their passengers, if any, to a law firm and chiropractic clinic also involved in the scheme. The chiropractic clinics provided the law firms with fraudulent documents that misrepresented the nature and extent of the alleged injuries suffered by the participant drivers and/or their phony victims to substantiate bodily injury claims. The manufactured billing statements were then used by the participating law firm to make fraudulent settlement demands of insurance companies through the mail. State Farm contends that Giventer and Merlin, through the operation of two chiropractic clinics, namely Greenville Health Care and Pain Control Clinic ("Greenville Health Care") and Forest Health Care Clinic ("Forest Health Care"), participated in the conspiracy by providing to participating law firms fraudulent documents regarding the nature and extent of bodily injuries allegedly sustained by participant "victims." State Farm contends that these fraudulent documents were submitted by the participating law firms to substantiate fraudulent bodily injury claims that were presented and subsequently paid by State Farm. State Farm asserts claims against Giventer and Merlin under RICO, specifically, 18 U.S.C. §§ 1962(c) and (d).

State Farm also asserts a claim for common law fraud, contending that Giventer and Merlin made false and fraudulent misrepresentations of fact to it and other insurance companies regarding the facts and circumstances of the Sudden Stop Collisions; the existence, nature, and severity of the fraudulent soft tissue injures allegedly caused by those collisions; and the reasonableness and necessity of examinations, consultations, treatments, and testing procedures purportedly provided to the participants. State Farm contends that Giventer and Merlin intentionally concealed and failed to disclose material facts within their knowledge knowing that State Farm was ignorant of those facts. In particular, State Farm contends that Giventer and Merlin concealed and failed to disclose that the Sudden Stop Collisions were intentionally caused to manufacture fraudulent personal injury and property damage claims, the purported injuries of participants were fraudulent, and medical bills and related records reflected services that either never occurred or were not reasonably necessary.

State Farm seeks to recover $2,135,968.13 in actual damages as a result of the fraudulent bodily injury and property damage claims arising from the Sudden Stop Collisions, as well as statutory treble damages pursuant to 18 U.S.C. § 1964(c), and punitive damages under common law.

## B. Giventer's Contentions

Defendant Giventer denies State Farm's allegations, contending that he has no personal knowledge of the facts upon which State Farm's Complaint is based. Giventer contends that although he owned the chiropractic clinics in question, he lived and worked in California during their periods of operation and relied on Merlin, the office manager, and other staff members to handle the day-to-day management and operation of the clinics. Giventer contends that he did not enter into any agreements or understandings with respect to the referral of patients or payment of persons or entities for the referral of patients, and that he did not enter into any agreement as to the matters alleged to constitute a conspiracy. Giventer contends that he was misled by members of his staff regarding the management and operation of the clinics, including the source of income received by the clinics. Giventer therefore contends that he is not liable to State Farm under RICO or for common law fraud, and that he is not responsible for any of the claimed monetary damages.

Giventer also contends that State Farm's claims are barred or reduced in whole or in part by the applicable statute of limitations, assumption of risk or negligence of its employees, managing directors and agents, and by the conduct or negligence of the other named defendants in this action, which he contends are superseding causes to any conduct allegedly attributable to him. Giventer also contends that State Farm's claims are barred in whole or in part by its failure to mitigate damages, laches and estoppel.[3]

## II. *Findings of Fact*[4]

### A. *Findings*[5]

1. State Farm is a corporation incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois.

2. Merlin is a resident of California and former manager of Greenville Health Care and Forest Health Care, two of the chiropractic clinics involved in the alleged conspiracy. Merlin was born in Russia in 1957, and came to the United States, specifically, Los Angeles, California, in 1975.

3. Giventer is a resident of California. He was born in Odessa, Russia in March 1964, and came to the United States in 1980. Giventer graduated from Cleveland Chiropractic College in Los Angeles, California, in April 1992. Giventer became a licensed chiropractor in the state of California in January 1993. At or around the same time, on January 23, 1993, Giventer applied for a Texas chiropractic license, which he received in March of that year. Giventer maintained an active chiropractic license in Texas from approximately 1994 to 1996, after which time he elected not to renew his Texas license.

4. In August 1993, Giventer used his name and Texas chiropractic license to open or establish Greenville Health Care in Dallas, Texas. Giventer owned Greenville Health Care as a sole proprietor. Giventer did not intend to practice chiropractic medicine at Greenville Health Care, or elsewhere in Texas, when he established the clinic. He did, however, receive a percentage of the profits made by the clinic.

5. Greenville Health Care was operated on a day-to-day basis by a rotating set of managers, including Defendant Merlin, Boris Vayberman ("Vayberman"),[6] Rita Margusov ("Margusov") and Alla Dubinsky ("Dubinsky"), all of whom were either

3. As the court has entered default against Giventer, the affirmative defenses asserted in Giventer's answer and pretrial order are now moot. Likewise, the affirmative defenses asserted in Merlin's original answer to State Farm's complaint are moot, as the court has entered default against him.

4. As Giventer and Merlin are the only remaining defendants in this action, the court finds it unnecessary to make detailed findings as to those individuals and entities that have been dismissed from this action. The court will therefore focus primarily on the acts of Giventer and Merlin. To do otherwise would be unduly time-consuming and an unwise use of scarce judicial resources and of no assistance to the court in making the necessary findings of fact and conclusions of law required under Fed.R.Civ.P. 52(a). The court, of course, will include such background information as necessary pertaining to those individuals and entities that have been dismissed from this action to make its findings of fact and conclusions of law.

5. The facts contained herein are either undisputed, or the court has made the finding based on evidence in the record.

6. The court notes two variations on the spelling of this individual's last name. For example, in Merlin's deposition transcript, the last name is spelled "Viberman," while it is spelled "Vayberman" in other parts of the record. The court will use the name of "Vayberman" when referring to this individual.

relatives or personal acquaintances of Giventer and residents of California. Giventer continued to live and work in California, and was physically present at Greenville Health Care about 1% of the time during its period of operation. Giventer spoke to the staff by telephone on a weekly basis.

6. For the first six to seven months of the clinic's (Greenville Health Care) operation, Vayberman was the liaison between the clinic and Giventer. Vayberman ended his association with the clinic in early 1994.

7. In mid–1994, Alex Semyon Mirsky ("Mirsky") approached Dubinsky with a proposal to bring patients to Greenville Health Care. Dubinsky already knew Mirsky from California who had a reputation for producing cases for law offices and clinics in the Los Angeles area. Dubinsky agreed to participate in a scheme whereby Mirsky would send participants of staged automobile accidents to Greenville Health Care for chiropractic treatment.

8. The objective of the conspiracy was to defraud and obtain money and property from insurance carriers through fraudulent insurance claims based on deliberately caused automobile collisions ("Sudden Stop Collisions"), which was accomplished in the following manner:

   a. A recruiter, known as a "capper," would solicit individuals, usually from the Hispanic population, to be a driver or passenger in a vehicle to be used in a staged automobile accident.

   b. At the direction of a capper, the participant driver would target an innocent motorist traveling on a roadway and deliberately cause an automobile accident by maneuvering his vehicle in front of the targeted vehicle and intentionally slamming on his brakes to cause the innocent motorist to "rear-end" the participant's vehicle. Sometimes, "capping crews" in two or three other vehicles would "box in" a targeted vehicle to prevent the innocent driver from changing lanes when the participant driver's vehicle suddenly stopped, thereby causing a rear-end collision.

   c. Once a staged accident was executed, a capper would direct the participant driver and his passengers (usually two or three) to one of the law offices and/or one of the chiropractic clinics involved in the conspiracy. The participants all went to the same law office for representation of their claims, and generally all went to the same chiropractic clinic for treatment of their alleged injuries.

   d. The participating law offices referred participants to a participating chiropractic clinic. The chiropractic clinic would then generate false medical and billing records regarding the participants' alleged injuries, which were always soft-tissue injuries, and submitted the fraudulent medical records to the participating law office. The participating law office would then present (by demand letter) the participants' bodily injury claims (substantiated by the false medical records) to the innocent motorist's insurer for settlement.

   e. Once the claim was settled, the participating law office caused the insurance company to mail the settlement check to it (the law office). The settlement check was then taken to a designated "check casher," who was also involved in the scheme. After the settlement check was converted into cash, the proceeds were shared among the conspirators.[7]

---

7. *See* Proposed Joint Pretrial Order at Ex. C (Findings of Fact and Conclusions of Law at 6–7). In May 1999, the County Court at Law

9. In July or August 1994, an acquaintance of Mirsky's opened the Friedman Law Office for the express purpose of presenting fraudulent insurance claims based on deliberately caused automobile collisions.

10. Greenville Health Care accepted referrals from the Friedman Law Office and other law offices involved in the conspiracy. Greenville Health Care generated fraudulent medical and billing records based on its treatment of phony accident victims referred by participating law offices. These fraudulent records were delivered to the referring law office, which subsequently mailed them, along with a demand letter, to insurance companies, such as State Farm, in support of false and fraudulent insurance claims.

11. Merlin began communicating with Giventer on a regular basis after Vayberman ended his association with the clinic. Merlin met with Giventer either monthly or bi-monthly to discuss the clinic's finances. There were no written communications between Merlin and Giventer; all communications were oral.

12. During these meetings, Merlin would provide Giventer with a journal or ledger that reflected the receipts, or income, and expenses of Greenville Health Care. Merlin would also provide Giventer with the returned or canceled checks that had been drawn on the clinic's bank account at Bank of America Texas in Dallas, Texas, as well as the monthly bank statements regarding the account. Giventer reviewed these documents and the journal closely.

13. On occasion, Giventer, and a person who he identified as his accountant, would call Merlin and request certain documents regarding the clinic's checking account. Giventer never questioned any of the checks he reviewed, including a $10,000 check from Greenville Health Care to the Friedman Law Office, or the staff's use of his (Giventer's) signature stamp on checks.[8]

14. Merlin also advised Giventer of patient volume during the periodic meetings. Merlin informed Giventer that the clinic was seeing 15–20, sometimes 25 patients a day. Giventer often called the clinic and spoke with the chiropractors, who also advised him of how many patients were being seen on a daily basis.

15. Merlin knew that the Friedman Law Office was referring people who had been involved in staged automobile accidents to Greenville Health Care, and testified in his deposition that approximately 99% of all patients referred by that law office were involved in staged automobile accidents. Merlin knew that Greenville Health Care was generating fraudulent medical and billing records to substantiate personal injury claims, and that this information was being presented to insurance companies, including State Farm, for settlement. Merlin delivered reports to the

No. 1, Dallas County, Texas, made detailed findings of fact and conclusions of law with respect to several Texas Rule of Civil Procedure 13 sanctions actions filed against Bruce Friedman. The sanctions actions were based on the same scheme alleged in this case. The court therefore relies on the recitation of the scheme as previously stated by the County Court at Law No. 1.

**8.** Giventer gave contradictory testimony with respect to authorized use of his signature

stamp. Although Giventer initially testified that he never authorized anyone to use a rubber stamp of his signature, he later testified that he did authorize Merlin to use his signature stamp to open a bank account for Greenville Health Care, and to issue checks drawn on that account. Giventer insisted that Merlin had to request authorization on each occasion he used the stamp, but later testified that he (Merlin) was authorized to use the stamp without permission to endorse checks for deposit.

Friedman Law Office and picked up checks which had been received from insurance companies in settlement of fraudulent claims.

16. Giventer was aware that the vast majority of patients being seen at Greenville Health Care were referrals from various law offices, including the Friedman Law Office. Giventer was aware that the law office often called to set the patients' appointments, and that approximately 95% of the patients were being treated for soft-tissue injuries sustained during automobile accidents. Giventer ascertained this information from his periodic review of patient records.

17. In early 1995, Merlin closed Greenville Health Care, in part, because he discovered that the clinic was not being paid its full cut of all proceeds received from the insurance companies.

18. Around the same time, Isaak Shpitsek ("Isaak") approached Merlin with a proposal to open another clinic in Dallas. Meanwhile, Margusov (Merlin's sister) approached Alfred Freitas, an attorney in California for whom she had previously worked, about opening a Dallas law office. Shpitsek proposed that he and Margusov operate the law office, while Merlin and Shpitsek's spouse, Bella Shpitsek ("Bella"), operate the clinic. Merlin agreed to the arrangement, and informed Giventer that he intended to open a new clinic under Giventer's name. Merlin advised Giventer that he would, just as before, receive a percentage of the profits from the new clinic.

19. Forest Health Care opened in or around April 1995, of which Giventer was the sole proprietor. Giventer authorized his signature stamp to be used on the assumed name certificate filed for the clinic. The clinic was managed and operated by Bella and Merlin. The Freitas Law Office was established in or around June 1995, and was managed by Margusov and Isaak.

20. Both the Friedman Law Office and the Freitas Law Office referred clients to Forest Health Care. About 99% of Forest Health Care's patients were clients of the Friedman Law Office, the Freitas Law Office, and other law offices involved in the conspiracy. Virtually all of the patients being referred from the Freitas Law Office were Sudden Stop Collision participants that had been brought to the law office by cappers.

21. Just as he did with the operation of Greenville Health Care, Merlin met with Giventer either monthly or bi-monthly to discuss the financial condition of Forest Health Care. He also provided Giventer with a journal or ledger that reflected the income and expenses of Forest Health Care, and would, on occasion, also provide Giventer with returned or canceled checks that had been drawn on Forest Health Care's bank account.

22. Bella often called Giventer in California, and mailed him documents on a monthly basis, including canceled checks and bank account statements. Bella was authorized to use Giventer's signature stamp.

23. Forest Health Care generated fraudulent medical records on phony victims of staged automobile accidents. Personnel of Forest Health Care delivered fraudulent medical and billing records to the referring law offices, which subsequently mailed them, along with demand letters, to insurance companies, including State Farm, in support of false and fraudulent personal injury claims.

24. Merlin and Giventer knew that the Friedman Law Office and the Freitas Law Office were referring people who had been involved in staged automobile accidents to Forest Health Care. Merlin further knew that personnel of Forest Health Care were

generating fraudulent medical and billing records, that such records were being used to substantiate fraudulent personal injury claims, and were being mailed to various insurance companies, including State Farm, to substantiate false and fraudulent personal injury claims.

25. Yevgeny Geft cashed checks of insurance proceeds for Greenville Health Care and Forest Health Care, as well as checks issued to those clinics by the Friedman Law Office and the Freitas Law Office. The proceeds from those checks were shared among those persons participating in the conspiracy.

26. Forest Health Care ceased operation in 1996.

27. On January 21, 1999, the grand jury for the Dallas Division, Northern District of Texas, returned a forty-four count sealed Indictment, charging several of the participants in the conspiracy, including Rita Margusov, with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (18 U.S.C. § 1341), mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341 and 2, conspiracy to launder money in violation of 18 U.S.C. § 1956(h), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) based on their participation in an organized scheme to fake automobile accidents in Dallas, Texas to collect insurance proceeds. The criminal case, styled *United States v. Michael Friedman, et al.,* Criminal No. 3:99–CR–019–L, was assigned to this court.

28. On July 26, 1999, Merlin was charged in a one count superseding Information with misprision of felony, a violation of 18 U.S.C. § 4. On August 4, 1999, the grand jury returned a forty-seven count superseding Indictment, charging, in addition to those previously named in the original Indictment, Bella Shpitsek, Isaak Shpitsek and others with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (18 U.S.C. § 1341); mail fraud and

aiding and abetting in violation of 18 U.S.C. §§ 1341 and 2; conspiracy to launder money in violation of 18 U.S.C. § 1956(h); and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) based on their participation in the scheme.

29. Merlin pled guilty to misprision of felony in July 1999. Margusov pled guilty to conspiracy to commit mail fraud in August 1999. Bella Shpitsek and Isaak Shpitsek pled guilty to conspiracy to commit mail fraud in January 2000. Pursuant to Fed.R.Evid. 201, the court takes judicial notice of the guilty pleas entered by these individuals and others charged in the criminal case, as well as the statements contained in their factual résumés. In particular:

a. Defendant Merlin pled guilty to misprision of a felony. In his factual résumé, Defendant Merlin admitted that he had knowledge of the actual commission of conspiracy to commit mail fraud, and concealed the conspiracy by diverting patients' insurance company checks to another individual who cashed them.

b. Bella Shpitsek pled guilty to conspiracy to commit mail fraud. In her factual résumé, Ms. Shpitsek admitted that, between May 1995 and April 1996, she was a part of an organization that staged fake automobile accidents to collect insurance proceeds. She admitted that she assisted in the operation of Forest Health Care, one of the purposes of which was the generation of false and fraudulent medical records which she knew would be the basis of false and fraudulent insurance claims which would be processed through the use of the mail.

c. Isaak Shpitsek pled guilty to conspiracy to commit mail fraud. In his factual résumé, Mr. Shpitsek admitted that, between March 1995 and

April 1996, he was a part of an organization that staged fake automobile accidents to collect insurance proceeds. He admitted that he assisted in the operation of Forest Health Care, one of the purposes of which was the generation of false and fraudulent medical records which he knew would be the basis of false and fraudulent insurance claims which would be processed through the use of the mail.

d. Rita Margusov pled guilty to conspiracy to commit mail fraud. In her factual résumé, Margusov admitted that, between August 1993 and July 1996, there was an agreement among the owners and operators of at least four law firms, including the law offices of Bruce Friedman and Alfred Freitas, and six medical clinics, including Greenville Health Care and Forest Health Care, in the Northern District of Texas to stage accidents, falsely inflate medical costs, and use the falsely inflated medical costs to make fraudulent demands on as many as eighty insurance companies through the mail. Margusov admitted that she managed two of the chiropractic clinics (namely, Greenville Health Care and Forest Health Care), the purpose of which was the generation of false and fraudulent medical records which she knew would be the basis of false and fraudulent insurance claims which would be processed through the use of the mail. Margusov also admitted that she managed one of the four involved law firms.

e. Michael Friedman (a/k/a Mikhail Fridman) pled guilty to conspiracy to commit mail fraud. In his factual résumé, Michael Friedman admitted that, between August 1994 and January 1996, there was an agreement among the owners and operators of at least four law firms, including the law offices of Bruce Friedman and Alfred Freitas, and six medical clinics, including Greenville Health Care and Forest Health Care, in the Northern District of Texas to stage accidents, falsely inflate medical costs, and use the falsely inflated medical costs to make fraudulent demands on as many as eighty insurance companies through the mail. Michael Friedman admitted to managing one of the law offices. He also admitted he had independent knowledge that cappers recruited persons to be phony victims in staged accidents, and the cappers took the recruited persons to law firms that were part of the conspiracy, and then to chiropractic clinics.

f. Igor Basovich pled guilty to conspiracy to commit mail fraud. In his factual résumé, Basovich admitted that, between August 1993 and July 1995, there was an agreement among the owners and operators of at least four law firms, including the law offices of Bruce Friedman and Alfred Freitas, and six medical clinics, including Greenville Health Care and Forest Health Care, in the Northern District of Texas to stage accidents, falsely inflate medical costs, and use the falsely inflated medical costs to make fraudulent demands on as many as eighty insurance companies through the mail. Hundreds of accidents were staged, and fraudulent demands for settlement in excess of $20,000,000 were made. Basovich admitted to being a capper, that is, one who recruited others to be phony victims, and to acting as a phony victim himself. He admitted that he took the persons he recruited to law firms and chiropractic clinics that were part of the conspiracy.

g. Yevgeny Geft pled guilty to conspiracy to commit mail fraud. In his factual résumé, Geft admitted that, between August 1993 and July 1996, there was an agreement among the owners and operators of at least four law firms, including the law offices of Bruce Friedman and Alfred Freitas, and six medical clinics, including Greenville Health Care and Forest Health Care, in the Northern District of Texas to stage accidents, falsely inflate medical costs, and use the falsely inflated medical costs to make fraudulent demands on as many as eighty insurance companies through the mail. Hundreds of accidents were staged, and fraudulent demands for settlement in excess of $20,000,000 were made. Geft admitted that he cashed insurance proceeds checks for each of the four law firms and each of the six chiropractic clinics, so the money could be split among the co-conspirators. Geft also admitted to acting as a capper on one occasion, and to participating in his own fraudulent accident on another occasion.

30. During the period of the conspiracy, State Farm received fraudulent insurance claims based on approximately 153 Sudden Stop Collisions. Greenville Health Care and Forest Health Care were involved in treating participants in 62 of the 153 Sudden Stop Collisions.

31. State Farm has incurred actual damages in the amount of $ 2,135,-968.13.

## III. *Conclusions of Law*

### A. State Farm's Claims Under RICO

RICO provides a civil cause of action to recover treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962." *See* 18 U.S.C. § 1964. State Farm contends that Giventer and Merlin have violated §§ 1962(c) and (d) of RICO. Reduced to their simplest terms, these subsections mean:

(c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d) a person cannot conspire to violate subsections ... (b), or (c).

*See St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 439 (5th Cir.2000) (*quoting Crowe v. Henry,* 43 F.3d 198, 203 (5th Cir.1995)). To establish a § 1962(c) violation, State Farm must prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Ashe v. Corley,* 992 F.2d 540, 544 (5th Cir.1993).

State Farm alleges the Dallas Law Office of Bruce Friedman, the Dallas Law Office of Alfred Freitas, Greenville Health Care, Forest Health Care and Irving Rehabilitation Clinic (identified by State Farm as the "Sudden Collision Stop Ring Enterprise") comprise an association-in-fact enterprise. As stated before, the court has entered default against Giventer and Merlin; therefore, this contention is undisputed. Nevertheless, the court is unable to conclude, based on the evidence presented, that the association-in-fact described satisfies the RICO definition for such an enterprise.

To establish an association-in-fact enterprise, State Farm must show " 'evidence of an ongoing organization, formal or informal, and ... evidence that various associates function as a continuing unit.' " *Id.* at 205 (citations omitted). Because an

association-in-fact enterprise must be shown to have continuity, *Calcasieu Marine Nat'l Bank v. Grant,* 943 F.2d 1453, 1461 (5th Cir.1991); *see also Crowe,* 43 F.3d at 205; *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 243 (5th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989), the Fifth Circuit has stated that such an enterprise "(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Crowe,* 43 F.3d at 205; *Calcasieu,* 943 F.2d at 1461; *Delta Truck,* 855 F.2d at 243. "Since an association-in-fact enterprise must have an existence separate and apart from the pattern of racketeering, *Delta Truck,* 855 F.2d at 243, proof of a pattern of racketeering activity does not necessarily establish a RICO enterprise." *Calcasieu,* 943 F.2d at 1461 (citations omitted). State Farm must therefore plead specific facts which establish that the association exists for purposes other than simply to commit the predicate acts. *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989); *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 427 (5th Cir.1987).

■ The enterprise alleged in this case as an association-in-fact is comprised of various law offices and chiropractic clinics. The evidence establishes that each of the entities listed had a shared or common purpose of defrauding and obtaining money and property from insurance companies, including State Farm. State Farm, however, has not shown the existence of an ascertainable structure separate and apart from the alleged pattern of racketeering. In other words, there is no evidence that the association of law offices and chiropractic clinics existed separate and apart

from the alleged pattern of racketeering. Aside from the commission of the alleged predicate acts, there appears to be nothing which binds the association together. As such, State Farm has failed to show continuity—that the Sudden Stop Collision Ring Enterprise existed for any purpose other than to commit the predicate offenses, that is, mail fraud. Accordingly, the court concludes that State Farm's civil RICO claim under § 1962(c) fails as a matter of law.

State Farm also asserts a claim under § 1962(d), contending that Giventer and Merlin conspired to violate subsection (c). Because State Farm has failed to show the existence of an association-in-fact enterprise, it cannot establish that Giventer and Merlin conspired to violate subsection (c). State Farm's claim for conspiracy under § 1962(d) therefore necessarily fails as a matter of law.[9]

### B. State Farm's Common Law Fraud Claim

State Farm alleges a claim for common law fraud, contending that Giventer and Merlin made false and fraudulent misrepresentations of fact to it and other insurance companies regarding the facts and circumstances of the Sudden Stop Collisions, the existence, nature, and severity of the fraudulent soft tissue injures allegedly caused by those collisions, and the reasonableness and necessity of examinations, consultations, treatments, and testing procedures purportedly provided to the participants.

■ The elements of actionable fraud in Texas are as follows: (1) that a material representation was made; (2) that it was false; (3) that the speaker knew it was false when made or that the speaker made

---

**9.** Even though Merlin and Giventer are in default, the court must have some legal basis to award damages, and if no legal basis exists, an award of damages would be improper.

it recklessly without any knowledge of the truth and as a positive assertion; (4) that the speaker made it with the intention that it be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) suffered an injury or damage as a result thereof. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Shannon v. Law–Yone,* 950 S.W.2d 429, 433 (Tex.App.—Fort Worth 1997, pet. denied).

■■■ The evidence establishes that Merlin knew that personnel of Greenville Health Care and Forest Health Care generated numerous medical reports and billing statements which contained false and fraudulent information and representations regarding the existence, nature, and severity of alleged soft tissue injures of persons involved in Sudden Stop Collisions, and the alleged reasonableness and necessity of examinations, consultations, treatments, and testing procedures purportedly provided to the participants involved in those collisions. The evidence further establishes that Giventer signed narrative reports for patients at Forest Health Care based on the information contained in the patient files, without ever having seen the patients. The evidence establishes that Merlin knew that these documents were being submitted to law offices participating in the scheme to defraud insurance companies, as he would often deliver such documents to the participating law offices himself, and that those entities were forwarding the medical records, along with demand letters, to various insurance companies, including State Farm, in connection with personal injury claims.

The evidence also establishes that State Farm relied on the false and fraudulent material misrepresentations of fact contained in the medical reports and billing statements generated by Greenville Health Care and Forest Health Care, and that it

(State Farm) paid sums of money to the Dallas Law Office of Bruce Friedman and the Dallas Law Office of Alfred Freitas in settlement of fraudulent personal injury claims. The evidence further establishes that those law offices subsequently wrote checks to Greenville Health Care and Forest Health Care for their purported services, and that Merlin and Giventer received a portion of the proceeds.

Although Giventer maintains that he had no knowledge that personnel of Greenville Health Care and Forest Health Care were generating fraudulent medical records and billing statements, or that such personnel were providing participating law offices with documents containing false and fraudulent information, the court finds this assertion to be not credible based on the record evidence. Even though the court was unable to witness Giventer's appearance, demeanor, and manner of testifying during his deposition, it finds his deposition testimony to be not credible. The court finds this to be so even considering the possibility of confusion caused by any language barrier, as Giventer's native language is Russian, based on an apparent lack of candor and truthfulness during various parts of his deposition.

For example, Giventer acknowledged that he knew about "cappers" prior to opening his Texas chiropractic clinics, and that he first learned of cappers while in chiropractic school. Giventer testified that he was aware that cappers attempted to sell cases to clinics, and that many cappers were involved in the personal injury business and routinely approached clinics. Giventer testified that he specifically warned Merlin, prior to the opening of Greenville Health Care, "Don't do anything illegal. Especially don't be in business with cappers." Merlin, however, testified that he did not speak with Giventer prior to the opening of Greenville Health

Care, as Boris Vayberman was the liaison between the managers and Giventer at that time. Merlin also specifically denied that Giventer ever instructed him not to become involved in criminal activity in Texas, or advised him not to do business with cappers.

Giventer's testimony concerning the opening of his first Dallas clinic, Greenville Health Care, is also inconsistent with other evidence in the record. According to Giventer, Merlin approached him with the idea of opening a chiropractic clinic in Dallas. Giventer testified that Merlin told him he had experience in operating clinics, and that if Giventer opened the clinic he (Merlin) would manage it. Giventer testified that he agreed to open the clinic even though he never inquired about the clinics that Merlin previously operated, or the occupations in which he engaged prior to 1993. Giventer insisted that Merlin paid the start-up costs for the clinic and negotiated the lease, and that Merlin, Margusov, and another woman came from California to Texas in shifts to run Greenville Health Care.

Merlin, however, testified that Boris Vayberman, Giventer's cousin, sent Giventer to Texas to obtain a chiropractic license, and Giventer acknowledged that he had already obtained a Texas license before Merlin approached him. When asked about Vayberman during his deposition, Giventer gave less than candid testimony. Indeed, Giventer only mentioned Vayberman when he was questioned briefly about a particular chiropractic clinic in California that was owned by Dr. Myron Cook, who provided a recommendation in support of Giventer's Texas chiropractic license. When asked the identity of the Cook clinic office manager, Giventer answered, "Who

was the office manager? Hold on a second. Let me think. I believe, if I'm not mistaken, I think it was my—I think it was my cousin, Boris, I believe." He then identified "Boris" as Boris Vayberman. Giventer testified that this was the only clinic of which he knew that Vayberman managed. As stated in the court's findings above, however, Vayberman was one of four managers of Greenville Health Care, and the liaison between the clinic and Giventer during the first few months of the clinic's operation. Merlin did not assume the role of liaison until after Vayberman left the clinic.

Giventer also gave evasive testimony in regard to his knowledge of the Dallas law office of Alexander Gudis.[10] Giventer testified that he was unaware that Gudis had a Dallas office, and that he first heard about the law office by way of questioning during his deposition. Giventer further testified that he was surprised to learn that a law office that supplied 20–30% of the patients at his California chiropractic clinic also had a branch in Dallas that sent patients to Giventer's chiropractic clinics in Dallas—Greenville Health Care and Forest Health Care. Giventer then changed his testimony, stating that he was not surprised that Gudis's Dallas office sent patients to his (Giventer's) Dallas clinics, and that he was also aware of the referrals. Giventer eventually admitted that the majority of the patients at Greenville Health Care were referrals from the Friedman Law Office and Gudis's Dallas office, and conceded that referrals from these offices accounted for about 90% of the patients at Greenville Health Care.

Considering the evidence in its entirety, the court believes that Giventer knew that

**10.** The court notes Alexander Gudis was one of the defendants named in the previously mentioned superseding Indictment returned by the grand jury in August 1999. Gudis, who was one of the attorneys involved in the scheme, pled guilty to conspiracy to commit mail fraud in January 2000.

personnel of both Greenville Health Care and Forest Health Care were generating false and fraudulent medical reports and billing statements to substantiate fraudulent personal injury claims. Giventer was the sole proprietor of both clinics, and he knowingly and willingly permitted personnel at those clinics to generate fraudulent medical and billing statements in furtherance of the fraudulent insurance scheme, or deliberately turned a blind eye to such activity.

As a result of Giventer and Merlin's fraudulent conduct, State Farm has incurred actual damages in the amount of $ 2,135,968.13. The court further determines that State Farm has established by clear and convincing evidence that the harm it suffered resulted from fraud and wilful conduct by Giventer and Merlin. Given the magnitude of the scheme and nature of conduct, the court believes that an award of punitive damages of approximately one and one-half times the economic loss suffered by State Farm is reasonable. Such amount is necessary to serve as a punishment for these two defendants and as a deterrent to them and others who may be inclined to engage in the same conduct as these defendants. Moreover, such an award of punitive damages falls within the guidelines set forth in Chapter 41 of the Texas Civil Practices & Remedies Code. The court therefore concludes that State Farm should be awarded punitive damages in the amount of $3 million.

For the reasons stated, State Farm's RICO claims under 18 U.S.C. § 1962(c) and (d) are hereby **dismissed with prejudice.** State Farm is entitled to judgment on its claim of common law fraud in the amount of $5,135,968.13 ($ 2,135,968.13 and $3,000,000 in punitive damages), jointly and severally against Defendants Giventer and Merlin. Judgment will issue by separate document pursuant to Fed.R.Civ.P. 58.